UNITED STATES of America, Plaintiff–
Appellant–Cross–Appellee,

v.

Russell K. BAKER, Jr., Roger L. Baker,
Defendants–Appellees–Cross–
Appellants.

No. 91–3753.

United States Court of Appeals,
Eleventh Circuit.

April 22, 1994.

Hugh N. Smith, Smith & Fuller, PA, Barbara E. Glover Moore, Tampa, FL, for Russell K. Baker, Jr.

Rodney W. Morgan; Shear, Newman, Hahn & Rosenkranz, P.A., Tampa, FL, for Roger L. Baker.

Gary H. Montilla, Thomas M. Findley, Karla R. Spaulding, Linda J. McNamara, Tamra Phipps, Asst. U.S. Attys., Tampa, FL, for U.S.

Before KRAVITCH and BIRCH, Circuit Judges, and CLARK, Senior Circuit Judge.

CLARK, Senior Circuit Judge:

Defendants Russell K. Baker Jr. and Roger L. Baker were convicted of mail fraud, money laundering, and related charges for their parts in a scheme to defraud their former employer, a corporate defense contractor, out of approximately one-half of a million dollars in commission payments. Defendants appeal their convictions and sentences. The government appeals one of the district court's sentencing decisions, specifically, the district court's grant of defendants' requests for downward departures from the applicable sentencing guidelines ranges. We affirm the convictions and find unmeritorious defendants' challenges to their sentences. As to the government's challenge to the downward departures, we remand the case for the district court to articulate the mitigating circumstances justifying the downward departures from the applicable guidelines ranges.

## I. FACTS

Defendants Russell K. Baker Jr. and Roger L. Baker, who are brothers, were indicted along with their father, Russell K. Baker Sr., on charges of mail fraud, 18 U.S.C. § 1341, conspiracy to commit mail fraud, 18 U.S.C. § 371, interstate transportation of fraudulently obtained property, 18 U.S.C. § 2314, engaging in monetary transactions in property derived from a criminal activity, 18 U.S.C. § 1957, and interstate travel in aid of racketeering, 18 U.S.C. § 1952(a). All three Bakers were at one time employed by Aerodyne Investment Castings, Inc., a closely-held corporation that manufactured parts used in the engines of military aircraft and armored vehicles. Russell Baker Sr. was president and general manager of Aerodyne until his retirement in 1987; he also owned 21 percent of Aerodyne's stock. Russell Baker Jr. was vice-president of Aerodyne, and then became president and general manager when his father retired. Roger Baker was a sales manager for Aerodyne. Aerodyne had a total of four shareholders. Other than Russell Baker Sr., they were Darty Cronin, who owned 51 percent of the stock, David Janney, who owned 22.5 percent of the stock, and Richard Lester, who owned 5.5 percent of the stock. All four shareholders were members of Aerodyne's Board of Directors. Russell Baker Jr. was also a member of the Board.

In 1985, while Russell Baker Jr. was still vice-president of Aerodyne, he and Roger Baker both had sales responsibilities at Aerodyne. Their duties included making sales, bidding on contracts, negotiating contracts, and finding new customers. Aerodyne paid each of the brothers a salary. They were *not* paid any sales commissions on the contracts they obtained for Aerodyne. On September 27, 1985, Aerodyne was awarded a major government contract with the Army Aviation Systems Command ("AVSCOM"). The Baker brothers were responsible for obtaining this contract for Aerodyne.

Approximately a week before the award of the AVSCOM contract, the Baker brothers and an Indiana resident named Warren Fisher formed a partnership known as Midwest Military Marketing. Russell Baker Jr. owned 47½ percent of the partnership, Roger Baker owned 47½ percent of the partnership, and Fisher owned the remaining five percent. Fisher was named manager of Midwest, and he signed letters and other documents as president of Midwest. Fisher did not, however, have signatory authority on Midwest's bank account; he could write a check on Midwest's account only if he also had the signature of either Russell Baker Jr. or Roger Baker. Indeed, in all material respects, Fisher merely followed the Baker

brothers' instructions in undertaking any actions on behalf of Midwest. Russell Baker Jr. told Fisher that no one other than the three partners needed to know who actually owned Midwest. On September 18, 1985, Fisher purchased letterhead stationary for Midwest. Midwest did not have offices; the address on the letterhead was a post office box in the Indiana town where Fisher resided.

At or around the time of the formation of the Midwest partnership, Russell Baker Jr. provided Fisher with a letter and a proposed sales representative contract; Baker instructed Fisher to sign the two documents and mail them to Aerodyne, addressed to Russell Baker Sr., President. Both the letter and the proposed contract are dated July 17, 1985, but they are both on Midwest letterhead and, therefore, could not have been prepared until sometime on or after September 18, 1985. Both documents are signed by Fisher, as president of Midwest. The proposed contract sets out the terms of a sales representative agreement between Aerodyne and Midwest, pursuant to which Aerodyne appointed Midwest as its exclusive representative on AVSCOM accounts and agreed to pay Midwest a six percent commission on all contracts issued to Aerodyne by AVSCOM. Such sales representative agreements are a common method of compensating independent sales representatives when they are successful in obtaining a government contract for a defense contractor. In fact, neither Fisher nor Midwest obtained the AVSCOM contract for Aerodyne. Rather, it was the Baker brothers, working as salaried employees of Aerodyne, who obtained the contract. Fisher's letter accompanying the proposed contract states that the contract is consistent with the agreement reached between Russell Baker Sr. and Fisher during a telephone conversation on July 15, 1985. At trial, Fisher testified that he did not recall any such conversation. Thus, the July 1985 letter and proposed contract were intended to create the illusion that Fisher had obtained the AVSCOM contract for Aerodyne, that Aerodyne had agreed to pay Fisher commissions for this service, and that Fisher wanted to receive these commissions through his company, Midwest.

Upon receipt of the July 1985 letter and proposed contract, Russell Baker Sr. signed the contract on behalf of Aerodyne and, in October 1985, forwarded a copy to David Janney, in anticipation of having the Board of Directors approve the contract. The Board took up the subject of the contract at a meeting held in December 1985. At this meeting, Russell Baker Sr. sought Board approval of the contract, representing that Fisher was responsible for obtaining the AVSCOM business for Aerodyne and, therefore, was owed commissions. David Janney and Darty Cronin objected to the contract because they felt the six percent commission was exorbitant. Russell Baker Sr. eventually agreed to renegotiate the terms of the contract, but he stated that Fisher would sue Aerodyne if he did not receive his commissions. Russell Baker Jr. was present at this December 1985 Board meeting. He did not tell the Board members that he, not Fisher, obtained the AVSCOM contract for Aerodyne. He also did not mention his or his brother's ownership interest in Midwest.

After the December 1985 Board meeting, Russell Baker Jr. provided Fisher with another letter, which Fisher, at Baker's instruction, signed and mailed to Aerodyne. This letter contains several misrepresentations regarding Fisher's experience with other defense contractors. In the letter, Fisher agreed to adjust his commission rate such that he would receive a six percent commission on contracts up to $1,000,000, a four percent commission on contracts from $1,000,000 to $3,000,000, and a two percent commission on contracts over $3,000,000. Russell Baker Sr. forwarded this letter to Janney, again in anticipation of having the Board of Directors approve the Midwest contract, modified to reflect this scaled commission rate. The Board eventually approved the contract. Both Darty Cronin and David Janney believed that the purpose of the contract was to pay Fisher for his services in obtaining the AVSCOM contract for Aerodyne. Neither Cronin nor Janney knew that the Baker brothers owned 95 percent of Midwest.

In accordance with the terms of the contract, Aerodyne began sending commission checks to Midwest. After these checks were deposited in Midwest's account, the Baker brothers caused the proceeds to be distributed, with 95 percent of the proceeds going to the brothers and five percent to Fisher. Aerodyne eventually paid Midwest more than $500,000 in commission payments.

In late 1987, the Aerodyne shareholders began negotiating to sell Aerodyne to a British company. Because the British company had its own sales force, Aerodyne's contract to pay commissions to Midwest became detrimental to the proposed deal. Russell Baker Jr., who by that time had become president and general manager of Aerodyne, told David Janney that he would try to convince Fisher to cancel the Midwest contract. Russell Baker Jr. then instructed Fisher to write a letter to Aerodyne stating that Midwest would agree to discontinue the contract with Aerodyne. Fisher did so. The sale of Aerodyne to the British company was never consummated, and Russell Baker Jr. disregarded the letter from Fisher and continued Aerodyne's relationship with Midwest; he told Janney that he had no choice but to do so.

The Baker brothers' scheme was eventually discovered during a government investigation of defense contractors. The Aerodyne Board of Directors accepted resignations from all three of the Bakers. Thereafter, the Board was successful in selling Aerodyne.

The Bakers' theory of defense was that they lacked criminal intent to deceive Aerodyne. Specifically, the Bakers attempted to show that they could not have thought that their actions were wrong because these actions were consistent with the practices of Aerodyne's other shareholders and directors.

The first trial of the three Bakers resulted in a mistrial because the jury could not agree on a verdict. Following the second trial, the jury convicted Russell Baker Jr. on all counts, convicted Roger Baker on all counts except one, and acquitted Russell Baker Sr. The district court sentenced Russell Baker Jr. to 27 months in prison, to be followed by three years supervised release, and sentenced Roger Baker to 18 months in prison, to be followed by three years supervised release.

## II. *THE CONVICTIONS*

### A. *Limitation on Presentation of Theory of Defense*

Defendants' first argument is that the district court erred by improperly limiting the presentation of their theories of defense. Defendants sought to establish that they lacked criminal intent by showing that their actions in taking money through Midwest were consistent with the practices of Aerodyne's other officers and directors. Defendants argue that the district court's rulings prevented them from effectively presenting this defense because they were unable to adequately establish the manner in which Aerodyne was operated, as shown by the intercorporate and related-party dealings among the officers and directors of Aerodyne. Specifically, defendants contend that the district court (1) improperly limited their cross-examination of Cronin, Janney, and John Giles, another government witness, on the intercorporate dealings among the Aerodyne shareholders and related companies; (2) improperly excluded documents showing the "recast earnings" of Aerodyne and several other companies in which Aerodyne's Board members had an interest; (3) improperly excluded expert testimony regarding defendants' corporate duties to Aerodyne; and (4) improperly declined to instruct the jury on defendants' theory of defense and on corporate duties owed to Aerodyne. These four contentions are discussed separately below. By discussing the theory of defense, we do not rule as a matter of law that the theory was valid or invalid. Defendant Russell Baker Sr. was a shareholder and director of Aerodyne at the time of the alleged crime and the jury returned a verdict of not guilty to the charges against him. The two Baker sons, who were found guilty, were not shareholders of Aerodyne. Although Russell Baker Jr. was a vice-president and director, he, like his brother Roger, was a salaried employee. We make no ruling on whether the two appellants had standing to advance their theory of defense, but for the sake of discussion assume they did.

### 1. *Limitation on Cross–Examination*

■ We have carefully reviewed the trial testimony of Cronin, Janney, and John Giles. Defense counsels' cross-examination of these witnesses covers more than 300 pages of transcript. Testimony was elicited from these witnesses about their financial interest in seeing defendants convicted;[1] about the Aerodyne shareholders' financial interests in other, related companies, some of which competed with Aerodyne;[2] about Aerodyne's practice of permitting its shareholders, directors, and officers to engage in outside employment and to receive income from other companies;[3] about the Aerodyne shareholders' improper practice of taking profits from Aerodyne by creating and submitting invoices rather than by taking dividends;[4] about Cronin's ownership interest in the property on which Aerodyne operated and his use of Aerodyne monies to deal with environmental problems on the property;[5] about the sale of one of Cronin's companies to Aerodyne;[6] about Cronin's interest in other companies that were sold along with Aerodyne;[7] about Janney's employment with the company that purchased Aerodyne;[8] about the Aerodyne Board's approval of another commission contract similar to the contract with Midwest;[9] about the allegations of wrongdoing among the officers and directors of Aerodyne;[10] about lawsuits reflecting intercorporate battles among the officers and directors of Aerodyne;[11] and about the Aerodyne shareholders' individual income tax reporting.[12] This cross-examination was more than adequate to develop defendants' theory of defense.

■ Defendants complain about numerous specific restrictions on their cross-examination. Only two of these specific restrictions warrant discussion. First, defendants complain that they were not permitted to establish that Cronin forced Aerodyne to purchase products from him at inflated prices. Although the district court did sustain objections to some questions on this subject, defense counsel elicited admissions from Cronin that one of his companies sold products to Aerodyne and that there were disputes among the shareholders as to the price of these products.[13] In addition, during the defendants' case, Russell Baker Jr. testified that Cronin required Aerodyne to purchase certain products from one of his companies and overcharged Aerodyne for these products.[14] Thus, defendants did establish Cronin's questionable dealings with Aerodyne. Second, defendants complain that they were not allowed to establish that, between the first and the second trial, Cronin and Janney created "an elaborate fiction"[15] to explain the methods by which they took profits from Aerodyne. Defense counsel questioned Cronin and Janney at length regarding their methods of taking profits from Aerodyne, challenging Cronin and Janney with allegedly inconsistent statements made by each during the first trial and in the grand jury proceedings. However, Cronin's and Janney's testimony in the first trial as to the methods of taking profits from Aerodyne was substantially similar to their testimony in the second trial.[16] Thus, defendants' inability to establish the claimed "elaborate fiction" was not due to limitations on cross-examination. Having carefully reviewed the

1. R21–15; R23–81.

2. R21–19–22; R21–62–63; R21–141; R21–150.

3. R21–150; R22–184–186.

4. R21–99–105; R22–161–163; R23–34–36; R23–44.

5. R21–25.

6. R21–132.

7. R21–149–150.

8. R22–154.

9. R21–84–85.

10. R21–15–18; R22–165.

11. R21–16; R21–95–97; R22–165; R22–191.

12. R23–27–30; R23–38–41.

13. R21–150–151; R21–156.

14. R24–106–107.

15. Defendants' Initial Brief at 29.

16. R8–49–60; R8–112; R9–24–30.

record in this case, we conclude that the district court did not commit reversible error in limiting defense counsels' cross-examination.

## 2. *Exclusion of Recast Earnings*

■ Defendants argue that the district court erred in declining to admit a series of documents that showed the "recast earnings" of Aerodyne and several related companies. One of Aerodyne's prospective purchasers had retained an accounting firm to gather information and "recast" the earnings of Aerodyne and several related companies to reflect what the earnings would have been had the prospective purchaser owned the companies. Defendants contended that the recast earnings documents were relevant because defendants could use the documents to impeach Cronin's and Janney's testimony regarding the profit distribution at Aerodyne. Defense counsel were unable to establish either the exact sources of the information that the accounting firm used in calculating the recast earnings or the reliability of those sources.[17] The district court declined to admit the recast earnings documents, holding that there was "a legal requirement to make the connection between [the information provided] and any one of those ... shareholders before they can be—before knowledge or lack of knowledge can be inferred them." [18] We find that the recast earnings documents were not reliable, were of marginal relevance, and could have caused the jury considerable confusion.[19] Moreover, the district court did permit defense counsel to question the accountant who prepared the recast earnings documents as to his knowledge of the distribution of profits at Aerodyne.[20] We find no reversible error.

## 3. *Expert Testimony On Corporate Duties*

■ Defendants argue that the district court erred in declining to permit their expert witness to testify as to defendants' corporate duties to Aerodyne under the Aerodyne Articles of Incorporation and Florida law. They argue that they were entitled to establish through this testimony that defendants had no duty to disclose their interest in Midwest to Aerodyne's directors. Having carefully reviewed the record, we conclude that this argument is without merit.

Defendants mischaracterize the government's case against them. Defendants argue that the government's case against them was based upon their failure to disclose their interest in Midwest to the Aerodyne Board members; thus, they argue, the expert's testimony was relevant in that it would establish that they had no duty to make such a disclosure. In fact, the government's case was based *not* upon defendants' failure to disclose information; rather, it was based upon defendants' affirmative misrepresentations and active concealment. Indeed, in his closing argument to the jury, the prosecutor said:

> The government's theory is not that the defendants are guilty because they were part of Midwest Military Marketing and they didn't tell anybody. That's not the government's theory. The government's theory is that they were part of Midwest Marketing and they lied to the board about what Midwest Military Marketing was, who was in charge of it, who was doing what and what Aerodyne was getting for the commissions. They are charged because of the false documents in the files and the false statements that they made.[21]

Defense counsel during closing argument also stressed this point:

> The defendants' failure to disclose their ownership interest in Midwest Military Marketing is not an issue in this case. I'm going to repeat that. It's vitally important. The defendants' failure to disclose their interest in Midwest Military Marketing, their ownership interest in Midwest

17. R24–21–30.

18. R24–74.

19. *See* Fed.R.Evid. 403.

20. R24–63; R24–78.

21. R26–43–44.

Military Marketing is not an issue in this case.[22]

Finally, the district court instructed the jury:

Now, you have been instructed in this case that the defendants are charged with mail fraud; that is, a scheme to defraud involving the use of the mails which involves false statements. The charges which you are to consider in this case are based only on the making of affirmative, false statements and are not based on a failure to disclose certain facts. The defendants' failure to disclose their ownership in Midwest Military Marketing is not an issue in this case.[23]

Thus, to prove its case against defendants, the government had to establish that defendants made affirmative misrepresentations. Defendants' duty, or lack thereof, to disclose information was not relevant to the jury's determination of whether defendants made affirmative misrepresentations.

To the extent defendants' duty, or lack thereof, to disclose their interest in Midwest may have been relevant to defendants' theory of defense, that defense was adequately presented. Although the district court did not permit expert testimony on the subject, it did permit full development of the subject through other evidence. For example, defendants introduced into evidence Aerodyne's Articles of Incorporation and used a blow-up of relevant portions of the Articles for argument to the jury. Russell Baker Jr. testified as to his understanding of his duties under the Articles of Incorporation.[24] Finally, at defendants' request, the district court charged the jury on the Florida law on corporate duties.[25] Defendants presented ample evidence to support their theory of defense, and an expert witness would not have aided the jury's understanding of this evidence. Accordingly, we find no reversible error.

### 4. Jury Instructions

■ Defendants argue that the district court erred in declining to instruct the jury

on their theory of defense. This argument is absolutely without merit. The district court instructed the jury:

It is the defense of all defendants in this case that no false statements or material facts were made to the Aerodyne Board of Directors and that no false statements were made in order to conceal their ownership of Midwest Military Marketing. Further, it is the position of all defendants that they did not have an intent to defraud the shareholders of Aerodyne or Aerodyne itself out of money or property. Rather, the defendants contend that because they believed the transaction was fair and reasonable to Aerodyne at the time, and that considering the course of dealings of the officers, directors and shareholders of Aerodyne, the Articles of Incorporation of Aerodyne and Florida corporate law, their actions in implementing their ownership interest in Midwest Military Marketing, they had no intent to defraud.

The defendants also contend that based on the course of dealings between and among the other directors individually with their related companies in Aerodyne, the Aerodyne Articles of Incorporation and Florida corporate law, they had a good faith belief that the related party transaction between Midwest Military Marketing and Aerodyne was proper.

. . . . .

Now, good faith is a complete defense to the charges in the Indictment, since good faith on the part on the defendant is inconsistent with intent to defraud or willfulness, which is an essential part of the charges. The burden of proof is not on the defendant to prove his good faith, of course, since he has no burden to prove anything. The government must establish beyond a reasonable doubt that the defendant acted with specific intent to defraud as charged in the Indictment.[26]

This instruction adequately apprised the jury of defendants' theory of defense.

22. R26–80.

23. R26–148–149.

24. R24–134.

25. R26–156.

26. R26–155–158.

B. *Other Jury Instructions*

1. *The Mail Fraud Instruction*

■ Relying on *McNally v. United States*, [27] defendants argue that the district court's mail fraud instruction was flawed because it did not require that the jury find that the government had proven a loss of money or property. In *McNally,* the Supreme Court held that the mail fraud statute is limited in scope to the protection of monetary and property rights and does not protect a citizen's intangible right to good government. Defendants argue that the government proved only that they deprived Aerodyne of its right to honesty and loyalty, an intangible right that cannot be the basis of a mail fraud conviction under *McNally.* Thus, defendants contend that their convictions cannot stand.

To assess defendants' *McNally* claim, we must look to the indictment and the jury instructions to determine whether the jury could have convicted defendants of defrauding Aerodyne of an intangible, non-property right, such as the right to honesty and loyalty. As this court has said:

> In the plethora of post-*McNally* cases addressing challenges to pre-*McNally* mail fraud convictions, the courts uniformly have looked to the wording of the indictment and the jury instructions to determine if the convictions can stand. If the indictment and jury instructions were phrased in such a way that the jury *could* have convicted the defendant of scheming to defraud the victim of a *McNally* -type intangible right, the courts have reversed the convictions. Conversely, if the jury necessarily *must* have concluded that the defendant schemed to defraud the victim of a non-*McNally* type of right (i.e. a monetary or property right, whether tangible or intangible), then the convictions stand, even if the indictment charged and the jury was instructed on *McNally* -type

intangible rights in addition to non-*McNally* rights.[28]

Defendants' case is not even close; the indictment charges and the jury was instructed *only* on non-*McNally* monetary and property rights. The indictment charges that defendants "knowingly devised and intended to devise a scheme and artifice to defraud Aerodyne Investment Castings, Inc. and the shareholders of Aerodyne of *money and property* ...." [29] Similarly, the district court charged the jury that defendants were guilty of mail fraud only if they "knowingly and willfully devised a scheme to defraud or for obtaining *money or property* by means of false pretenses, representations or promises.... [T]he word scheme includes any plan or course of action intended to deceive others, and to obtain by false or fraudulent pretenses, representations or promises *money or property* from the persons so deceived." [30] The jury was not instructed on the intangible rights theory; that is, no instruction was given that defendants' convictions could be based upon the deprivation of Aerodyne's right to honesty and loyalty. The government proved that defendants obtained more than $500,000 from Aerodyne through their scheme. Given the language of the indictment and the jury instructions, the jury necessarily must have concluded that defendants schemed to defraud Aerodyne of money. Accordingly, defendants' challenge to their convictions under *McNally* is without merit.

2. *The Interstate Transportation of Stolen Property Instruction*

■ Defendants argue that the district court also erred in instructing the jury on the interstate transportation of stolen property charges. Section 2314 of Title 18 makes it a federal offense for any person to transport in interstate or foreign commerce "any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the

---

27. 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).

28. *United States v. Dynalectric Co.,* 859 F.2d 1559, 1570–71 (11th Cir.1988) (footnotes omit-

ted), *cert. denied,* 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 157 (1989).

29. R1–1–11 (emphasis added).

30. R26–147 (emphasis added).

same to have been stolen, converted or taken by fraud." [31] Defendants were charged on three counts with transporting three checks drawn on the account of Aerodyne and made payable to Midwest or Fisher. In charging the jury on these counts, the district court followed the Eleventh Circuit Pattern Jury Instructions, with one small modification. The pattern instructions refer only to "stolen property," as opposed to property "stolen, converted or taken by fraud." The pattern instructions then incorporate the conversion and fraud aspects of the crime through the definition of "stolen," which is defined to include "any wrongful and dishonest taking of property with the intent to deprive the owner of the rights and benefits of ownership." [32] The district court followed these pattern instructions, except that it referred throughout the instruction to property "stolen or taken by fraud," rather than merely to "stolen property." [33] Section 2314 clearly criminalizes the interstate transportation of property taken by fraud, as well as of stolen property. We find no reversible error.

### C. Constitutionality of Money Laundering Statute

Defendants contend that 18 U.S.C. § 1957, which prohibits engaging in monetary transactions in criminally derived property, violates the Fifth Amendment because it is constitutionally vague and overbroad. Because defendants' challenge does not involve the First Amendment, we review the statute as it was applied in this case. [34] As the Supreme Court has said, "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." [35]

**31.** 18 U.S.C. 2314.

**32.** Eleventh Circuit Pattern Jury Instruction 55.1.

**33.** R26–149.

**34.** *United States v. Awan,* 966 F.2d 1415, 1424 (11th Cir.1992).

**35.** *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982) (footnote omitted).

■ Section 1957 makes it a federal crime for any person to "knowingly engage[ ] or attempt[ ] to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity...." [36] The statute requires that the defendant know that the property is "criminally derived," but it does not require that the defendant know that the property was derived from "specified unlawful activity." [37] "Criminally derived property" is defined as "any property constituting, or derived from, proceeds obtained from a criminal offense." [38] Thus, the government must prove that the defendant knew that the property was obtained from a criminal offense. In this case, the government proved that defendants deposited into their bank accounts funds that they had derived from their own criminal fraud activities. We find that this conduct is "clearly proscribed" by § 1957. Accordingly, § 1957 is constitutional as applied to defendants. [39]

### III. THE SENTENCES

### A. Denial of Departure Under U.S.S.G. § 5K2.10

■ Defendants argue that the district court erred in declining to grant them a downward departure pursuant to U.S.S.G. § 5K2.10, which authorizes a district court to reduce a defendant's sentence below the guideline range "[i]f the victim's wrongful conduct contributed significantly to provoking the offense behavior...." The government correctly responds that a defendant may not appeal a district court's refusal to make a downward departure from a guide-

**36.** 18 U.S.C. § 1957(a).

**37.** 18 U.S.C. § 1957(c).

**38.** 18 U.S.C. § 1957(f)(2).

**39.** Our ruling on the constitutionality of § 1957 is limited to the facts of this case. *See Hoffman,* 455 U.S. at 495, 102 S.Ct. at 119 (in addressing a vagueness challenge, the "court should ... examine the complainant's conduct before analyzing other hypothetical applications of the law").

line sentencing range.[40] In this appeal, however, defendants do not argue the merits of the court's refusal to depart, that is, that the court should have departed because the victims' conduct was wrongful; rather, defendants contend that the district court believed that it was without statutory authority to grant a downward departure under § 5K2.10. While such a challenge does present a cognizable claim on appeal,[41] our review of the record indicates that the district court was aware that it had the power to depart from the guideline range. The district court declined to grant a downward departure under § 5K2.10 because it concluded that the facts of defendants' case did not warrant it.[42] Accordingly, defendants' argument is without merit.

### B. *Grant of Departure Under U.S.S.G. § 5K2.0*

The government argues that the district court erred in granting both defendants a downward departure pursuant to U.S.S.G. § 5K2.0 and 18 U.S.C. § 3553(b). The probation officer calculated defendants' base offense level by applying U.S.S.G. § 2S1.2, the guidelines provision applicable to engaging in monetary transactions in property derived from specified unlawful activity, 18 U.S.C. § 1957, the most serious of defendants' counts of conviction. The district court accepted § 2S1.2 as the applicable guideline and then granted both defendants downward departures from the range established by this guideline. At Russell Baker Jr.'s sentencing hearing, the court explained that § 2S1.2 "does substantially overrepresent the defendant's conduct."[43] At Roger Baker's sentencing hearing, the court said that there were "mitigating circumstances not adequately taken into consideration by the guidelines."[44] The court did not, however, articulate the "mitigating circumstances" except to say that the defendant's "core offense was mail fraud, and that the use of the money laundering guideline in 2S1.2 [over]represented the seriousness of the actual offense."[45]

Section 5K2.0 of the sentencing guidelines and 18 U.S.C. § 3553(b) authorize a district court to impose a sentence outside the range established by the applicable guidelines if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." This court has said that departures pursuant to these provisions are "reserved for 'unusual' cases where there is something atypical about the defendant or the circumstances surrounding the commission of the crime which significantly differ from the normal or 'heartland' conduct in the commission of the crime."[46] This court has made clear, however, that a mitigating circumstance may justify departure even if it varies only in *degree* (as opposed to in *kind*)

---

**40.** *United States v. Fossett*, 881 F.2d 976, 979 (11th Cir.1989).

**41.** *Id.*

**42.** R27–16–22; R28–56–63; R28–74–75; R28–82–83.

**43.** R28–83.

**44.** R27–29.

**45.** *Id.* Throughout the sentencing proceedings of both Russell Baker Jr. and Roger Baker, the district court and the parties referred to defendants' offense of conviction as "money laundering." More precisely, defendants were convicted of "engaging in monetary transactions in property derived from specified unlawful activity," in violation of 18 U.S.C. § 1957; this crime has a maximum penalty of 10 years and a base offense level of 17. U.S.S.G. § 2S1.2. Defendants were neither indicted for nor convicted of "laundering of monetary instruments," in violation of 18 U.S.C. § 1956, which has a maximum penalty of 20 years and a base offense level of at least 20. U.S.S.G. § 2S1.1. The commentary to the guidelines distinguishes these two crimes by explaining:

> 18 U.S.C. § 1957 is similar to 18 U.S.C. § 1956, but does not require that the recipient exchange or "launder" the funds, that he have knowledge that the funds were proceeds of a specified unlawful activity, nor that he have any intent to further or conceal such an activity.

U.S.S.G. § 2S1.2, comment. (n. 1).

**46.** *United States v. Gonzalez–Lopez*, 911 F.2d 542, 549 (11th Cir.1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

from circumstances embodied in the guidelines.[47] For example, in *United States v. Williams*, [48] this court held that post-arrest, pre-sentence recovery from addiction is a mitigating factor of the kind that the Commission adequately considered in fashioning the guidelines; nevertheless, "a truly extraordinary post-arrest, pre-sentence recovery may exceed the degree of recovery contemplated [by the guidelines] and therefore justify a downward departure." [49] A downward departure may also be justified if the offense conduct does not typify the conduct anticipated by the Sentencing Commission for the applicable guideline.[50]

 Our review of the district court's downward departures in this case is hampered by that court's failure to articulate the mitigating circumstances upon which it relied. The Ninth Circuit has held that a downward departure "is not permitted unless the district court has identified a mitigating circumstance of a kind or to a degree the Sentencing Commission did not adequately take into account when formulating the Guidelines." [51] Thus, in reviewing downward departures, the Ninth Circuit considers "the reasons for departure actually articulated by the sentencing court." [52] We think this a sound approach. A district court granting a downward departure from the applicable guidelines should articulate the specific mitigating circumstances upon which it relies and the reasons these circumstances are of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission. Because the district court in this case did not do this, we remand this case with instructions that the court articulate the mitigating circumstances justifying the downward departures.

47. *United States v. Chotas*, 968 F.2d 1193, 1195 (11th Cir.1992).

48. 948 F.2d 706 (11th Cir.1991).

49. *Id.* at 710–11.

50. *See United States v. Skinner*, 946 F.2d 176 (2d Cir.1991) (downward departure from money laundering guidelines range authorized because

*CONCLUSION*

For the reasons discussed above, the convictions of defendants Russell K. Baker Jr. and Roger L. Baker are AFFIRMED. As to defendants' sentences, the case is REMANDED for the district court to articulate the mitigating circumstances justifying the downward departures from the applicable guidelines ranges.

Sentencing Commission failed to adequately consider that defendant's monetary transactions, which were merely to complete simple drug sales, could result in convictions under the Money Laundering Act).

51. *United States v. Valdez–Gonzalez*, 957 F.2d 643, 647 (9th Cir.1992).

52. *Id.* (internal quotations omitted).