United States Court of Appeals,

Eleventh Circuit.

Nos. 93-3058, 94-3261.

UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,

v.

Goldean ADAMS, Bruce Raybon Jones, Warren E. Adams, Defendants-Appellants, Cross-Appellees.

UNITED STATES of America, Plaintiff-Appellee,

v.

$22,264.90 IN UNITED STATES CURRENCY, Defendant,

Warren E. Adams; Goldean Adams, Claimants-Appellants.

Feb. 12, 1996.

Appeals from the United States District Court for the Middle District of Florida. (No. 92-293-CR-T-99A), Anne C. Conway, District Judge.

Before EDMONDSON, Circuit Judge, HILL, Senior Circuit Judge, and MILLS[*], District Judge.

RICHARD MILLS, District Judge:

All parties appeal—including the Government.

A jury convicted Warren Adams, Goldean Adams and Bruce Raybon Jones of conspiring to commit an offense against or to defraud the United States (18 U.S.C. § 371).

The Adamses were also convicted of making false statements to the Resolution Trust Corporation (RTC) (18 U.S.C. § 1001), misapplying funds belonging to the RTC (18 U.S.C. § 657), impeding the lawful functions of the RTC (18 U.S.C. § 1032(2)), and money laundering (18 U.S.C. §§ 1956(a)(1)(A)(i) & 1957).

[*]Honorable Richard Mills, U.S. District Judge for the Central District of Illinois, sitting by designation.

The district court sentenced Warren Adams to 46 months in prison, Goldean Adams to 27 months imprisonment, Jones to 1 month in prison, and all three to 3 years of supervised release and payment of restitution. In a later proceeding, the district court ordered $22,264.09 previously belonging to Warren and Goldean Adams forfeited.

Asserting numerous errors, the Adamses and Jones challenge their convictions and the forfeiture. And the Government appeals the sentences given to Warren and Goldean Adams.

We affirm all three convictions, Jones' sentence, and the forfeiture, but we vacate the Adamses' sentences and remand for further sentencing proceedings.

## I. FACTS

On June 1, 1990, the failed Investors Federal Savings and Loan Association (IFS) was placed under the conservatorship of the RTC which then assumed responsibility for managing IFS assets, including the Palma Ceia Apartments and the Briarwood Apartments (The RTC properties).

Warren and Goldean Adams owned and operated a property management business known as Golco Management Company (Golco). In December of 1990, the RTC entered into an agreement with Golco to manage the RTC properties. Pursuant to the agreement, Golco handled the day-to-day operations of the properties, including collecting rents and paying general operating expenses. The agreement also authorized Golco—with the Adamses having signatory authority—to open and maintain two bank accounts (RTC accounts) which were the property of the RTC. The contracts also required

Golco to submit detailed monthly statements accounting for expenses and income.

Unfortunately, the Adamses failed to abide by the agreements and used Golco to defraud the RTC. Specifically, the record shows that Warren and Goldean Adams altered invoices in order to have the RTC pay for goods and services that were not used to maintain the RTC properties, used a dormant company—SWAT Development Corporation (SWAT)—as a vehicle for billing the RTC for work that was never performed or performed prior to the RTC contract, and improperly profited by falsifying bids on projects paid by the RTC.

The record also shows that the Adamses laundered money. Specifically, on April 8, 1991, Warren Adams withdrew the balance of one account at the Fortune Savings Bank (Fortune) that contained funds fraudulently induced from the RTC and purchased a cashier's check paid to the order of Golco in the amount of $11,798.09. After purchasing the check, Adams deposited it in an account at the Great Western Bank (Great Western). Fortune, however, refused to honor the check because it was not endorsed by Golco. Thereafter, Great Western debited the $11,789.09 and returned the check to Adams. Undaunted, Adams then deposited the check in another account at Fortune and wrote a new check on that account for $11,789.09. He then deposited that check in the Great Western account.

Bruce Raybon Jones' role in the scheme was less direct. In March 1991, Warren Adams gave to Charles McGuire, his son-in-law, and Jones the dormant SWAT. Following the transaction, McGuire and Jones each owned 50 percent of the company. Thereafter, Jones and

McGuire opened a bank account on behalf of SWAT.  SWAT then performed services at various properties—including but not exclusive to the RTC properties—that were managed by the Adamses. For these services, the Adamses paid SWAT by checks drawn on the RTC accounts.

On December 10, 1991, after two disgruntled Golco employees—Ronald and Karen Pyle—told law enforcement officers about what was occurring at Golco, Federal authorities executed a search warrant of the Adamses' home.[1]  Following the search, Warren Adams, McGuire and Jones held a meeting at which Adams told McGuire and Jones that he had been billing the RTC for SWAT work that was never performed.[2]  Adams also asked McGuire and Jones to lie to law enforcement investigators regarding how SWAT operated.  On March 2, 1992, Jones followed Warren Adams' instructions.  McGuire, however, after initially going along with the scheme, broke down and confessed.[3]

## II. ANALYSIS

The Adamses and Jones raise a total of eight issues on appeal. The first four assert prosecutorial misconduct, the second two challenge the validity of the money laundering convictions, and the final two contest the forfeiture and Jones' conviction.  On cross-appeal, the Government maintains that the district court erred when it refused to sentence Warren and Goldean Adams based

---

[1] Both Ronald and Karen Pyle pleaded guilty to conspiracy under 18 U.S.C. § 371.

[2] The jury acquitted Jones of submitting false invoices and of causing the misapplication of funds.

[3] McGuire was not indicted.

upon their money laundering convictions.

A. *Prosecutorial Misconduct*

The Adamses and Jones claim that the prosecutor and one of the Government's witnesses made improper comments that denied them a fair trial. Specifically, they maintain that: (1) the prosecutor improperly referred to statements made by Karen Pyle; (2) the prosecutor deliberately violated the trial judge's instruction not to refer to Warren Adams' military record; (3) the prosecutor allowed Special Agent Wayne Lewis of the Office of Inspector General of the RTC to violate the district court's *Bruton* instruction during direct examination; and (4) even if none of the three errors standing alone denied them a fair trial, that combined, the cumulative effect of the errors created enough prejudice to deny them due process.

### 1. Karen Pyle

During opening statements, closing arguments, and during the course of the trial, the prosecutor and prosecution witnesses on a number of occasions referred to statements made by Karen Pyle. Karen Pyle, however, was never called as a witness.[4] Defendants assert that this prejudiced them because it improperly established guilt by association and because it turned the prosecutor into an unsworn witness. In response, the Government maintains that in the opening and closing statements the prosecutor only referred to evidence that was properly presented at trial, and that all references by witnesses at trial to out-of-court statements made by Karen Pyle were admissible because the statements were not

---

[4]Pyle was on the Defendants' witness list.

presented for the truth of the matter asserted.  The Government also argues that Defendants failed to timely object.[5]

A prosecutor's remarks mandate a new trial only if they are improper and prejudicially affect the defendant's substantial rights.  *United States v. Thomas,* 62 F.3d 1332, 1343 (11th Cir.1995).  A defendant's substantial rights are prejudiced if there is a reasonable probability that, but for the remarks, the outcome would be different.  *Kennedy v. Dugger,* 933 F.2d 905, 914 (11th Cir.1991), *cert. denied,* 502 U.S. 1066, 112 S.Ct. 957, 117 L.Ed.2d 124 (1992).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984).

In this case, both in her opening statement and during the questioning of Agent Lewis, the prosecutor referenced statements made by Karen Pyle that the Adamses were engaging in fraud.[6]  These

---

[5]In fact, at one point in the trial, counsel for Warren Adams did object to testimony by Agent Lewis that Karen and Ronald Pyle had told him that they had previously falsified documents and that Mr. and Mrs. Adams were continuing to commit fraud.  That counsel noted that "Karen Pyle has not been brought here to testify as a witness.  She's not been presented for this jury.  And now he's testifying as to what Karen Pyle told him about the Adamses."  The district court sustained the objection and asked the prosecutor to rephrase the question.

[6]In her opening statement, the prosecutor remarked:

> And Karen Pyle talked to Wayne Lewis and she admitted that she had falsified invoices and she said that also, the Adamses had falsified invoices and she told Mr. Lewis that she was fired so she was no longer doing it but that the Adamses were continuing to do it and continue to steal from the RTC.  Mr. Lewis opened up an investigative case on this and one of the things he tried to do was think of a way to see whether this was still happening.  Whether this whiting out or the

statements were improper because they went beyond what was needed to establish why Agent Lewis commenced an investigation. *See United States v. Novak,* 918 F.2d 107, 109 (10th Cir.1990) (prosecutor's statement that a citizen informant had reported and provided information to the police that the defendant was selling cocaine was improper hearsay that went beyond the scope of " "routine testimony' used by police officers to establish why they commenced an investigation."). Moreover, even if the statements were not hearsay, during opening statements prosecutors should avoid referring to evidence that is even of questionable admissibility. *United States v. Hernandez,* 779 F.2d 456, 459-60 (8th Cir.1985).

Nevertheless, because the record contains sufficient independent evidence establishing guilt, we conclude that the improper references to statements made by Karen Pyle do not raise a reasonable probability that, but for the remarks, the outcome would be different.

### 2. Warren Adams' Military Record

Shortly before trial the Government filed a motion *in limine* asking that the district court exclude evidence of Warren Adams' acts of heroism in Vietnam. Because the motion was filed just prior to trial, the issue was deferred until after opening statements. In the meantime, in their opening statements, both parties agreed to limit remarks regarding Adams' military service to the fact that he had served in the Army.

---

alterations that Karen Pyle was talking about, first of all, was true and, secondly, whether it was still happening.

Nevertheless, in her opening, the prosecutor made the following remark:

> Mr. Adams spent 20 years in the United States Army some 25 years ago. He retired from the United States Army some 25 years ago. But the leadership skills that he developed in the United States Army 25 years ago, he began using in his management company in order to manipulate really other people to commit fraud on the RTC with him.

Defendants did not object. Instead, counsel for Warren Adams noted in his opening statement:

> Now, the Government, and I quote, just told you Adams spent 20 years in the Army. Skills he learned in the Army, he used to manipulate other people to commit a fraud on the RTC. Are those the skills people learn when they're serving the defense of this country? Do you learn skills to manipulate people to commit frauds or do you learn skills about being a manager, do you learn skills about leading people, do you learn skills about honesty, integrity, trustworthiness? What do you learn in the Army?
>
> Do you learn that if you have a secret clearance, do you learn that what you do when you have documents that are very incriminating, like that were up there and you saw those documents were very incriminating, when you have a secret clearance to do certain confidential materials when you're in the service, you learn that you just rip them into four squares and throw them in a trash bag and throw them out in the trash?
>
> Do you think by any concept of your imagination that a career service person would destroy documents the way they say they destroyed them? That he doesn't know better than that? He doesn't know how to conduct an operation better than that?

During closing arguments the prosecutor compounded the error by going further into the area of military service, an area that was in no way relevant to the trial. The prosecutor stated:

> Now 25 years later, in a different season of his life. And by no means did I mean that the leadership skills that he used in the Army, that he learned in the Army, were not wonderful leadership skills that people learn in the military. My husband's a Navy pilot I would—

Immediately following the remark about the prosecutor's husband, counsel for Warren Adams objected and moved for a mistrial. The

district court sustained the objection, denied the motion, and instructed the jury to disregard the prosecutor's personal comments.

We find that the prosecutor's comments concerning the skills Warren Adams developed in the Army and her remark about her husband were improper. There was absolutely no reason why the United States Military needed to be interjected into this trial. The prejudice resulting from the improper comments, however, was minimal and the district court gave a curative instruction regarding the remark about the prosecutor's husband being a Navy pilot. *See Thomas*, 62 F.3d at 1343 (prejudicial remarks may be rendered harmless by a curative instruction). Therefore, viewed in context and against the entire record, there is simply not a reasonable probability that, but for the comments, the outcome would have been different.

### 3. Agent Lewis

Prior to trial, Warren Adams filed a motion for severance. The district court denied the motion but instructed the Government that it could not make reference to Warren Adams when presenting out-of-court statements uttered by Jones. *See Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

Despite the district court's ruling, during direct examination of Agent Lewis the following occurred:

Q: Did you speak to Mr. Jones in that March 2nd interview regarding the SWAT Great Western Bank Account?

A: Yes.

Q: And what Did Mr. Jones tell you?

A: He, he told me that when they took over SWAT, Mr. Adams had

a SWAT Bank account at Great Western Bank. And that he told me—

Following Agent Lewis' response, counsel for Warren Adams objected and moved for a mistrial. The district court sustained the objection and instructed the jury "to disregard any statement that Mr. Adams might have made or that Mr. Jones might have made about Mr. Adams."

On appeal, the Adamses and Jones maintain that the district court's decision not to grant a mistrial was error. They specifically contend that the prosecutor emphasized the Great Western account in her closing argument and that the *Bruton* violation cannot be viewed as harmless. Conversely, the Government maintains that if there was error, the error was harmless because other evidence presented at trial established that Warren Adams maintained a SWAT account at Great Western.

We hold that no *Bruton* violation occurred and that the district court's curative instruction sufficiently addressed the problem. No *Bruton* violation occurred because the statement was not facially incriminating. It was not facially incriminating because the reference to the bank account required linkage to other evidence. *See Richardson v. Marsh,* 481 U.S. 200, 208, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987) ("[w]here the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard evidence.").

Moreover, even if there was a *Bruton* violation, it was harmless. *See United States v. Foree,* 43 F.3d 1572, 1579 (11th Cir.1995) (*Bruton* violations subject to the harmless error doctrine). This statement was clearly harmless. First, the

curative instruction immediately followed the statement. *See United States v. Marolla,* 766 F.2d 457, 460 (11th Cir.1985) ("[t]he fact that the corrective instructions were contemporaneous with the out-of-court statements increases the effectiveness of the corrective instructions."). Second, the statement regarding Warren Adams having a SWAT bank account at Great Western was cumulative because other evidence showed that he had opened and maintained the account. Specifically, documentary evidence and the testimony of Charles McGuire demonstrated Adams' involvement with the account. *Compare United States v. Key,* 725 F.2d 1123, 1126-27 (7th Cir.1984) (*Bruton* violation existed because codefendant's confession was the only evidence that defendant committed fraud).

Therefore, when the prejudicial effect of the statement is compared to the properly admitted evidence of guilt, it appears clear that there is no reasonable probability that the improper statement contributed to the conviction. *Schneble v. Florida,* 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340 (1967).

### 4. Cumulative Error

The Adamses and Jones also submit that even if standing alone, the improper prosecutor statements and the *Bruton* violation do not warrant a new trial, that combined, the errors so prejudiced them that a new trial is mandated. *See United States v. Preciado-Cordobas,* 981 F.2d 1206, 1215 n. 8 (11th Cir.1993) (noting that "the cumulative effect of several errors that are harmless by themselves could so prejudice the defendant's right to a fair trial that a new trial might be necessary."). In response, the Government asserts that the alleged errors represent only an

insignificant portion of the trial, and could not have influenced the jury's verdict or affected the Defendants' substantial rights.

We agree with the Government. "A defendant is entitled to a fair trial not a perfect one." *Lutwak v. United States,* 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953). In this case, errors were made but the substantial rights of the Defendants were not affected by those errors because properly admitted evidence sufficiently established their guilt.

B. *Money Laundering*

The Adamses make two challenges to their money laundering convictions. First, they contend that there was insufficient evidence to convict them because the purchase of the $11,789.09 cashier's check from Fortune did not promote the fraud.[7] They assert that there was no promotion because the fraud had already been completed. Second, they maintain that the jury was improperly instructed regarding the $10,000 requirement in 18 U.S.C. § 1957.[8]

### 1. 18 U.S.C. § 1956

"The gravamen of a § 1956(a)(1)(A)(i) violation is the intent to promote specified unlawful activity." *United States v. Miller,* 22 F.3d 1075, 1080 (11th Cir.1994). The Adamses assert that there

---

[7]To sustain a conviction, the Government must prove that: (1) the proceeds of specified unlawful activity were generated; and (2) that the defendant, knowing the proceeds to be tainted, conducted or attempted to conduct a financial transaction with the proceeds with the intent to promote specified unlawful activity. 18 U.S.C. § 1956(a)(1)(A)(i).

[8]A valid conviction pursuant to 18 U.S.C. § 1957 requires evidence that the defendant "knowingly engaged or attempted to engage in a monetary transaction in criminally derived property that is of value greater than $10,000 and is derived from specified unlawful activity."

was no intent because there was no evidence that the financial transactions in question promoted the misapplication of funds belonging to the RTC. More specifically, the Adamses maintain that the simple act of purchasing a cashier's check did not promote anything because the fraud had already been completed.

Conversely, the Government argues that the transactions at issue—the purchase of the $11,798.09 cashier's check from Fortune and the deposit of $11,798.09 into the Great Western account—were both intended to promote the continued misapplication of RTC funds. In the alternative, the Government maintains that even if the fraud did not continue, this Court should adopt the reasoning of the other circuits that have held that it is possible to promote prior unlawful activity. *See, e.g., United States v. Paramo,* 998 F.2d 1212, 1218 (3rd Cir.1993) ("a defendant can engage in financial transactions that promote not only ongoing or future unlawful activity, but also prior unlawful activity."), *cert. denied,* --- U.S. ----, 114 S.Ct. 1076, 127 L.Ed.2d 393 (1994).

Because the evidence reviewed in a light most favorable to the Government demonstrates that the transactions promoted ongoing fraud, we decline to address whether promoting prior activity is sufficient. Specifically, the evidence showed that the transactions at issue helped the Adamses conceal their fraudulent practices by allowing them to deposit RTC funds into the Great Western account instead of directly into their personal accounts.

## 2. § 1957

The Adamses assert that the district court improperly instructed the jury regarding their money laundering conviction

pursuant to 18 U.S.C. § 1957.  They maintain that the district court erred because it did not instruct the jury that the criminally derived property must have a value greater than $10,000.  In response, the Government contends that the district court's instruction adequately explained the elements of § 1957.

In regard to jury instructions, "[s]o long as the instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed in the instructions."  *United States v. Starke,* 62 F.3d 1374, 1380 (11th Cir.1995).  Moreover, the instructions are reviewed as a whole without taking any part out of context.  *United States v. Cohen,* 631 F.2d 1223, 1227 (5th Cir.1980).[9]

The Adamses' primary challenge to the instruction is that it included the following:  "The Government need not prove that all of the property involved in the transaction was the proceeds of specified unlawful activity.  It is sufficient if the Government proves that at least part of the property represents such proceeds."  According to the Adamses, that language allowed the jury to convict even if they found only $1.00 to be from criminally derived property, and effectively negated the $10,000 requirement.

Prior to the above quoted instruction, however, the district court had instructed the jury that "[t]he Defendant[s] can be found guilty of that offense [§ 1957] only if all of the following acts are proved beyond a reasonable doubt:  First, that the Defendant[s] engaged in a monetary transaction in criminally derived property of

---

[9]Fifth Circuit decisions issued prior to October 1, 1981 are precedent in this circuit.  *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

a value greater that $10,000...."

We hold that—viewed as a whole—the instructions sufficiently instructed the jury as to the law. *See Starke,* 62 F.3d at 1380. Nevertheless, to avoid possible confusion, in the future we recommend that district courts make it clear that although not all of the property at issue must be criminally derived, at least $10,000 worth of it must be derived from the criminal activity. *See* 18 U.S.C. § 1957.

C. *Additional Defense Contentions*

The Adamses and Jones each raise one additional challenge to the propriety of the district court's proceedings. The Adamses challenge the forfeiture because the district court refused to grant a continuance, and Jones contests the sufficiency of the evidence supporting his conspiracy conviction.

There is no merit to either challenge and we reject both without additional discussion.

D. *Government's Cross-Appeal*

The Government challenges the sentences given Warren and Goldean Adams, arguing that the district court erred when it failed to calculate the Adamses' base offense levels using their 18 U.S.C. § 1956 convictions. The Government notes that by not applying the § 1956 convictions, which were contained in the Presentence Investigative Report (PSR), the district court reduced the respective base offense levels by ten levels. In a written sentencing order, the district court justified the decision in the following manner:

> The gravamen of the Adams' unlawful scheme is fraud and misapplication of RTC funds. It is difficult to conceive of

a situation in which a bank account would not be used in some manner in a fraud of this type. Therefore, it is the opinion of the Court that the base offense level of 13, which is the appropriate base offense level adjusted for specific offense characteristics for Counts 1 through 5 and 8 through 11, should be used in this instance, rather than the usual base offense level of 23 for money laundering.

Alternatively, the Court would depart downward 10 levels under 5K2.11 and sentence each of Defendants at a level 13. The conduct of the Defendants did not cause or threaten the harm or evil sought to be prevented by the law proscribing the money laundering offense. The sentences received by Defendants are more than adequate to reflect the seriousness of the offenses of which they were convicted, and provide just punishment for those offenses. The statutory purposes of sentencing are satisfied by the imposition of a sentence at a Level 13, which reflects the guideline range for the intended crime. *See* 18 U.S.C. § 3553.

Unless factual resolutions cloud the issue, the question of which base offense level is applicable is reviewed *de novo. United States v. Acanda,* 19 F.3d 616, 618 (11th Cir.1994). Similarly, the issue of whether a district court has the authority to depart downward from the applicable guideline range is subject to plenary review. *United States v. Godfrey,* 22 F.3d 1048, 1053 (11th Cir.1994).

The primary justification used by the district court to lower the base offense levels is contrary to the law. The jury found the Adamses guilty of violating § 1956. Therefore, the § 1956 convictions must be included in the sentence, and U.S.S.G. § 2S1.1 must be applied. The district court cannot simply ignore the fact that the Adamses were convicted of violating § 1956. *See* 18 U.S.C. § 3551. *See also United States v. Costales,* 5 F.3d 480, 488 (11th Cir.1993) ("a district court cannot use the post-trial sentencing process to call the jury's verdict into question.").

Accordingly, the only possible justification for the lowered

base offense levels is a downward departure. Moreover, because the district court predicated respective downward departures on the second prong of U.S.S.G. § 5K2.11, whether the departures are warranted hinges on the legal issue of whether § 1956 seeks to prevent the harms caused by the Adamses' conduct. *See United States v. Rojas,* 47 F.3d 1078, 1080 (11th Cir.1995).[10]

As noted by the Tenth Circuit, "[t]he legislative history behind the Money Laundering Control Act of 1986 is fairly sparse." *United States v. Johnson,* 971 F.2d 562, 568 (10th Cir.1992). However, the examples cited in the legislative history describe "classic" money laundering activities. *Id.* On the other hand, the plain language of the act itself "prohibits a much broader range of conduct than just the "classic' example of money laundering." *Id.* at 569. *See United States v. LeBlanc,* 24 F.3d 340, 346 (1st Cir.) ("[t]he language of the statute, in conjunction with the definitions provided in 18 U.S.C. § 1956(c), indicates that Congress intended to criminalize a broad array of transactions designed to facilitate numerous federal crimes."), *cert. denied, --- U.S. ----,* 115 S.Ct. 250, 130 L.Ed.2d 172 (1994).

The First and Eighth Circuits have addressed cases with very similar facts to this one and have concluded that the money laundering at issue did not warrant a downward departure. *United States v. Pierro,* 32 F.3d 611, 620 (1st Cir.1994), *cert. denied, --- U.S. ----,* 115 S.Ct. 919, 130 L.Ed.2d 799 (1995); *LeBlanc,* 24

---

[10]A departure predicated on "lesser harm" is a variation of the more typical "heartland" approach usually employed by district courts when justifying a downward departure in a money laundering case. *See e.g., United States v. Baker,* 19 F.3d 605, 615 (11th Cir.1994).

F.3d at 347; *United States v. Morris,* 18 F.3d 562, 569 (8th Cir.1994).

For example, in *Morris,* the Eighth Circuit remanded for resentencing after the district court failed to apply U.S.S.G. § 2S1.1 to a defendant who committed bank fraud, and then for the purposes of concealment transferred the proceeds of the bank fraud into a separate account. 18 F.3d at 569.

Additionally, the Second, Fifth, and Ninth Circuits have affirmed district courts that refused to depart downward because the money laundering at issue was considered to be "heartland" money laundering.[11] *United States v. Piervinanzi,* 23 F.3d 670, 685 (2nd Cir.), *cert. denied,* --- U.S. ----, 115 S.Ct. 259, 130 L.Ed.2d 179, and *cert. denied,* --- U.S. ----, 115 S.Ct. 267, 130 L.Ed.2d 185 (1994), *United States v. Leonard,* 61 F.3d 1181, 1185 (5th Cir.1995); *United States v. Willey,* 57 F.3d 1374, 1391-92 (5th Cir.1995); *United States v. Rose,* 20 F.3d 367, 374-75 (9th Cir.1994).

The Second Circuit in *United States v. Skinner,* 946 F.2d 176 (2nd Cir.1991), however, did remand a case back to the district court after the district court rejected a "heartland" argument. *Id.* at 179. Later Second Circuit cases, however, clarified that *Skinner* is an exception to the general rule that district court decisions not to downward depart are only reviewable if the district court erroneously concluded that it did not have legal authority to downward depart. *See Piervinanzi,* 23 F.3d at 685.

---

[11]In all three circuits, as in this one, the failure to grant a discretionary downward departure is not subject to appellate review. *See e.g., Leonard* 61 F.3d at 1185.

We agree with our colleagues in the First and Eighth Circuits that Congress intended to criminalize a broad array of money laundering activity, and included within this broad array is the activity committed by the Adamses.[12]  Simply stated, the money laundering engaged in by the Adamses is of the type considered by Congress and the Sentencing Commission.  Therefore, a departure that completely negates the effect of their money laundering convictions is clearly erroneous and an incorrect application of the Guidelines.  *See Williams v. United States,* 503 U.S. 193, 200, 112 S.Ct. 1112, 1119, 117 L.Ed.2d 341 (1992).

We do not, however, foreclose the possibility that on remand the district court might be able to articulate mitigating circumstances of a kind or degree that the Sentencing Commission did not adequately take into account when promulgating the Guidelines.  *See Baker,* 19 F.3d at 616 (remanding because district court failed to adequately articulate mitigating circumstances upon which it relied).  Specifically, the district court needs to identify how or why the Adamses' conduct caused or threatened to cause less harm than typical money laundering.

Finally, even if the district court finds that mitigating circumstances exist and warrant a departure, the district court does not have the authority to grant a departure that completely nullifies the effect of the jury finding the Adamses guilty of money laundering.  *Costales,* 5 F.3d at 488 (11th Cir.1993).

III. CONCLUSION

---

[12]Fraud and money laundering convictions, however, can be grouped under U.S.S.G. § 3D1.2(d).  *United States v. Mullens,* 65 F.3d 1560 (11th Cir.1995).

For the foregoing reasons, we AFFIRM the convictions of the Adamses and Jones, the forfeiture, and the sentence of Jones, but VACATE the sentences of the Adamses, and REMAND the case to the district court for re-sentencing.