United States Court of Appeals,

Eleventh Circuit.

No. 94-4029.

UNITED STATES of America, Plaintiff-Appellee,

v.

Alcides J. RAMOS, Defendant-Appellant.

Feb. 24, 1995.

Appeal from the United States District Court for the Southern District of Florida. (No. 93-332-CR-SM), Stanley Marcus, Judge.

Before KRAVITCH and CARNES, Circuit Judges, and FAY, Senior Circuit Judge.

FAY, Senior Circuit Judge:

This appeal arises from Alcides Ramos's one-count conviction for possessing cocaine with intent to distribute. Pretrial, the magistrate granted Ramos's Rule 15 motion to depose a witness deported to Colombia. On government motion, the magistrate reconsidered and vacated that order, denying the motion to depose.

On appeal, Ramos argues the magistrate erred in reconsidering and vacating her order. He asks this Court to reverse his conviction, grant a new trial, and reinstate the order allowing him to depose the third party. We grant partial relief and remand for further proceedings.

I. BACKGROUND

A. Procedure

A Miami grand jury indicted Alcides Ramos ("Ramos" or "the Defendant") on one count of possessing cocaine with intent to distribute. Ramos pleaded not guilty. Ten days later, Ramos filed an emergency motion under Federal Rule of Criminal Procedure 15 to

depose Ramon Yepez ("Yepez").  Ramos believed Yepez was at Krome Detention Center awaiting deportation.

One week later the government responded that Yepez had been deported five days before Ramos filed his emergency motion and asked the district court to deny the emergency motion as moot.  The next day, Ramos amended his Rule 15 motion, alleging he could locate Yepez in Colombia and still needed to depose him.  The district court denied the initial emergency motion and referred the amended motion to a magistrate.  Five days after referral, the magistrate granted the amended motion to depose Yepez.  That day, the government filed a response to the motion in the nightbox.  As a result, the magistrate granted the motion before the government responded.

A few weeks later, the district judge held a status conference.  Ramos's attorney advised the court that before Yepez left Krome he gave Ramos's attorney information exculpating Ramos. He further advised the court that whether Ramos would go to trial would turn on whether he could depose Yepez and secure the exculpatory testimony.  The prosecutor responded that the government would move for reconsideration because the magistrate had granted the Rule 15 motion prior to the government's response. The judge instructed the prosecutor to move quickly.

Two weeks later, the government moved for reconsideration. Over a week later, only five days before trial, the magistrate vacated her previous order and denied the amended motion to depose Yepez.  The government concedes this ground is invalid and error.  Ramos went to trial without having deposed Yepez, did not

call Yepez as a witness, and was convicted and sentenced on one count of possessing cocaine with intent to distribute.

## B. Facts

Yepez delivered three boxes of cocaine to Ramos's home. This is the lone fact on which both sides agree.

### i. Ramos's Version of the Facts

Ramos maintains the other facts are as follows: Ramos knew Yepez as a worker in a car wash where Ramos and his wife took their cars each week. One day, Yepez came to Ramos's home and asked to store some boxes there overnight while Yepez was moving. Ramos did not know the boxes contained cocaine. Rather, he thought they contained books. His wife directed Yepez to place the three boxes upstairs in the master bedroom. After Yepez left, and without Ramos's knowledge, she moved the smallest box into the closet to clear the floor space.

The following day agents came to Ramos's house and asked if it were his residence. He said yes. The agents then said they suspected he had drugs or drug money in his home and asked if they could search. He consented. Ramos immediately told the agents about the boxes and encouraged them to open the boxes because he did not want anything illegal in his home. He also told them he had $5000 cash.[1] He took the agents upstairs where two boxes sat in the master bedroom. The agents opened the boxes, found cocaine, and arrested Ramos.

During the search and arrest, Yepez drove by Ramos's house and

---

[1]Ramos's brother wrote him a $5000 check to purchase a home. According to Ramos, this is the $5000 cash found in his home.

was stopped by the agents. They arrested him and took him back to the Ramos house. Ramos identified Yepez as the man who had delivered the boxes; Ramos then signed a written consent to search form. He told agents Yepez had come by twenty minutes earlier but had said he would return later for the boxes.

When the search did not uncover the $5000 cash Ramos had mentioned earlier, the agents asked him where it was. He directed them to the bedroom closet where the agents found both the cash and the third box of cocaine. Ramos repeatedly said he had told them about the third box when they first arrived.

*ii. The Government's Version of the Facts*

The government's fact allegations differ. They basically agree with Ramos's actions described above; they dispute that Ramos did not know the boxes contained cocaine.

The agents began surveillance of the Super Seven Car Wash ("Super Seven" or "the car wash") where Yepez worked. Once, they followed Yepez from the car wash to Ramos's home.

On the morning of Ramos's arrest, the agents were watching the car wash. They saw several people entering, staying for long times, and leaving with no apparent purchases. The agents also saw several Super Seven employees including Yepez using outside pay phones. Shortly before noon, Ramos arrived at the Super Seven, went inside, and came out several minutes later with Yepez. They spoke for a few minutes outside before Ramos left in his red truck; Yepez reentered the car wash and went behind the counter. After Ramos left, the suspicious activity continued.

Later that day, Yepez left the car wash in a blue-green Toyota

Paseo. An agent followed him to a strip mall where Yepez parked, paced, repeatedly checked his watch, made a phone call, and left. The agent followed him to a second strip mall where Yepez entered a paint and body shop. Two other agents joined the surveillance at this point. After five to ten minutes, Yepez left the shop and drove to Ramos's home. This was the second time agents had followed Yepez to the Ramos home.

Yepez parked in the Ramos driveway, entered the home, and stayed around 20 minutes. During his stay a silver Honda parked in the driveway. Several people exited the Honda, entered the house, and came out a few minutes later. They appeared to the agents to be rushing to leave. One agent testified at trial that when the Honda occupants saw his car, they reentered the house before driving away. Soon after, Yepez walked outside; when he saw the agent's car, he ran back into the house. Five minutes later, he left the residence in his Paseo, performing "countersurveillance" maneuvers to lose anyone following him. Finally, he went home, entering his apartment complex through an automatic gate. His car remained there for 20-30 minutes.

Meanwhile, back at the Ramos house, Alcides Ramos left shortly after Yepez. He drove his red truck around for 20-30 minutes, driving past his own driveway three times. Finally, he returned home, parked in the driveway, looked around, and went inside.

After Ramos returned home, the agents approached his house to ask for consent to search. They noticed the front window blinds had been pulled aside to permit someone to look out. When Ramos answered the door, they told him they believed he had drugs or drug

money and asked if they could search his home. He consented. When the agents asked if he had drugs in the home, he immediately said no and told them about the boxes and $5000 cash. He led them to the master bedroom, showed the agents the two boxes in plain view, told them emphatically he had only two boxes, and encouraged the agents to open them. He also told the agents the $5000 cash was in another room.

After opening the box and the packets found inside, which revealed white powder now known to be cocaine, the agents arrested Ramos. They read him his Miranda rights; he waived them. He told the agents that a friend named "Moncho" had left the boxes at his home the night before. Ramos said he did not know the man's real name or address, but did describe Yepez's Paseo and said he had a beeper number for him. He also said "Moncho" had not been at his house that day. The agents asked Ramos for the $5000 cash he had mentioned when they first arrived. He said the money was in the closet (having earlier said it was not in the master bedroom).

During the search, Yepez drove by the Ramos home, was apprehended, and brought inside. The agents also searched his car. When the agents brought him inside, Ramos immediately identified Yepez as the owner of the boxes. Ramos then signed a consent to search form and described how "Ramon" had brought the boxes over the night before. Prior to this, Ramos steadfastly maintained he knew the man only as "Moncho" and did not know his real name. He also told the agent that Ramon (Yepez) had been to his house earlier that day, only 20 minutes before the agents arrived. Again, this statement contradicted what Ramos previously had told

another agent.

Meanwhile, the agent searching upstairs for the cash also found the third, smaller box of cocaine. When the agents confronted Ramos with the third box, he irately insisted he had told them about it earlier. The agents deny that Ramos had mentioned a third box.

The total retail value of the cocaine found in Ramos's bedroom was $8 million to $10 million.

## II. ANALYSIS

Rule 15 permits a district court to authorize a deposition in a criminal case when exceptional circumstances exist. *See* Fed.R.Crim.P. 15(a). The court's decision to authorize or deny the deposition will be upset only for an abuse of discretion. *United States v. Drogoul,* 1 F.3d 1546, 1552 (11th Cir.1993); *United States v. Mills,* 760 F.2d 1116, 1120 (11th Cir.1985).

In *Drogoul,* this Court held that three factors guide the exceptional circumstances analysis: whether (1) the witness is *unavailable* to testify at trial; (2) injustice will result because testimony *material* to the movant's case will be absent; and (3) *countervailing factors* render taking the deposition unjust to the nonmoving party.

### A. Unavailability

The government did not charge Yepez and immediately deported him to Colombia. Pretrial, the prosecution sought special permission from the State Department to have Yepez reenter the country to testify at Ramos's trial. Yepez, however, has refused to reenter the United States. Under *Drogoul,* a substantial

likelihood of unavailability can be found when the proposed deponent is beyond the subpoena powers of the United States and has declared his unwillingness to testify at trial, or even having declared willingness to testify cannot be subpoenaed if he changes his mind. *Drogoul,* 1 F.3d at 1553, 1557. We find a substantial likelihood Yepez that was unavailable under the meaning of Rule 15.

## B. Materiality

At no time before, during, or after trial has Ramos proffered anything to show that Yepez's testimony will exculpate him. His attorney merely stated in a pretrial colloquy with the district court judge that Yepez had "provided exculpatory information as to" Ramos. If this statement was the full extent of the attorney's proffer, it is insufficient. As this court stated in *United States v. Sheffield,* 992 F.2d 1164 (11th Cir.1993),

> [f]or error to be predicated on a ruling excluding evidence, Federal Rule of Evidence 103(a)(2) requires that "the substance of the evidence was made known to the court by offer or was apparent from the context within which the questions were asked." Fed.R.Evid. 103(a)(2). The purpose of this requirement is "to alert the [trial] court and opposing counsel to the thrust of the excluded evidence, enabling them to take appropriate action," and to construct a record appropriate for appellate review. *Parliament Ins. Co. v. Hanson,* 676 F.2d 1069, 1074 (5th Cir. Unit B 1982).

*Sheffield,* 992 F.2d at 1169. Such a proffer may be made by several means including affidavit, proffered testimony, or calling a witness to the stand; at the very least, the proffer must alert the district court to the substance of the evidence that is at peril of being excluded. *See id.*

To our surprise, however, the government has conceded on

appeal that Yepez's testimony was material, citing *Drogoul.*[2] Under *Drogoul,* material is a term of art that means *material to the party moving to depose.* Accordingly, we must accept *for purposes of appeal* the concession that Yepez's testimony was material to Ramos's defense. Nonetheless, we point out that the district court has never considered materiality *on the merits* because the defense has never proffered what the testimony will be.

## C. Countervailing Factors

The government rests its argument for upholding the denial of the Rule 15 motion on the presence of countervailing factors that render taking the deposition unjust.

The government lists the following countervailing factors: Yepez's testimony was suspect because he cannot be sanctioned for perjury; because the defense had neither taken nor scheduled the deposition when the magistrate vacated the order five days before trial, it was unclear the deposition could actually be taken; deposing a suspected drug dealer at a place and time arranged by an undisclosed third party in Medellin, Colombia, posed a serious threat to the prosecutor's safety; because the defense never detailed what Yepez's testimony would be, the testimony may have been irrelevant, cumulative, or inadmissible.

We find that none of these factors, whether taken singly or together, render taking the deposition unjust. Indeed, the court in *Drogoul* found that neither the possibility of inaccurate

---

[2]The government cited *Drogoul* for its understanding that it must concede Yepez's testimony was material. Appellee's Br. at 18. The government also conceded unavailability, though we agree evidence of unavailability is clear.

translations nor the defendant's inability to confront witnesses called only by deposition would render taking the deposition unjust. *See Drogoul* 1 F.3d 1554-56. Delay in moving to take the deposition was an insufficient countervailing factor as well. *Id.* at 1556. Moreover, *Drogoul* dealt with injustice to the defendant; here, we find it impossible to conclude that preserving Yepez's testimony through deposition would have been unjust to the government.

Although concern for the safety of an Assistant United States Attorney in Colombia may be warranted, it is obvious that our government has officials in Colombia who could attend; it is also clear that the deposition could be accomplished through written interrogatories.

## III. STANDARD OF REVIEW

The parties on appeal dispute whether the magistrate's error was harmless. Because the defense has proffered nothing other than the attorney's conclusory statement of what Yepez will say, we cannot decide that question. Accordingly, and in view of the government's concession, we must remand to the district court for further proceedings. This remand is to allow the district court to hear the defense's proffer and decide on the merits whether the Yepez deposition should be allowed.

Indeed, this may be a two step process. Should the district court allow the taking of the deposition, it will be in a position to evaluate whether the testimony is in fact exculpatory. Should such occur, the district court will also be in a position of determining whether or not a new trial is justified.

If the appellant is allowed to attempt to depose Yepez, and is not able to do so within a reasonable period, or if the deposition is completed and the district court finds the testimony is not sufficiently exculpatory, the conviction will stand.

## IV. CONCLUSION

We hold that the ruling of the magistrate vacating her order granting Ramos's Rule 15 motion was error.

We REMAND to allow the district court to consider the Rule 15 motion *on the merits.* The district court must permit the defendant to proffer facts establishing that Yepez's testimony will exculpate Ramos. If sufficient grounds are presented, the deposition should be allowed. If the deposition is completed, the district court must determine whether the testimony warrants the granting of a new trial. If not, the conviction stands.

REMANDED with instructions.