UNITED STATES of America,
Plaintiff–Appellee,

v.

Wilda M. THOMAS; Elizabeth
W. Thomas, Defendants–
Appellants.

No. 93–6673.

United States Court of Appeals,
Eleventh Circuit.

Sept. 5, 1995.

**1335**

Patrick B. Collins, Mobile, AL and Cecily Kaffer, Mobile, AL, for appellants.

* Honorable Truman M. Hobbs, Senior U.S. District Judge for the Middle District of Alabama,

J.B. Sessions, III, U.S. Atty. and Donna E. Barrow, Asst. U.S. Atty., Mobile, AL, for appellee.

Before CARNES, Circuit Judge, JOHNSON, Senior Circuit Judge, and HOBBS *, Senior District Judge.

CARNES, Circuit Judge:

Wilda and Elizabeth Thomas appeal their convictions and sentences for wire fraud and conspiracy to commit mail and wire fraud stemming from the operation of a loan brokerage firm. We affirm their convictions but remand for resentencing.

## I. STATEMENT OF FACTS

Wilda Thomas and her mother, Elizabeth Thomas, owned and operated a loan brokerage firm called The Regency Group in Birmingham, Alabama. The Regency Group purportedly matched borrowers with lenders for an advance fee. In March of 1988, Joe Roberts, one of the Regency Group's clients, complained about its practices to the Federal Bureau of Investigation, and he brought with him Carolyn Whittington, a Regency Group employee, whom the FBI interviewed. Whittington herself pleaded guilty to fraud charges in May of 1991, and she began to cooperate with the government in 1992 regarding her involvement with the Regency Group.

A grand jury indicted both Wilda and Elizabeth Thomas on October 22, 1992, for one count of conspiracy to commit mail and wire fraud, 18 U.S.C. §§ 2 and 371, and two counts of wire fraud, 18 U.S.C. § 1343. At trial, fifteen former clients testified that they paid advance fees to the Regency Group, and that the Thomases or Whittington at various times told them that funding for their loans was imminent or had already been approved. However, none of the loans the clients requested ever came through, and the Regency Group never refunded the clients' advance

sitting by designation.

fees. In addition, several clients testified that they wrote checks to the Regency Group in order to cover expense fees for processing loans, with the express written condition that the Regency Group would return the money if the loan did not receive funding. Those clients never received either a loan or a refund. Others testified that Whittington or the Thomases had told them the Regency Group had successfully funded loans in the past, which was not true. Finally, one client testified that he had executed a power of attorney for Elizabeth Thomas as President of the Regency Group, and that the Regency Group had abused that power of attorney by using it to obtain a loan without his knowledge. That client never received any of the money that was borrowed with his power of attorney.

Both Wilda and Elizabeth Thomas were convicted and sentenced on all three counts. On appeal, they raise eleven challenges to their convictions and two challenges to their sentences.

## II. ISSUES RELATED TO THE CONVICTIONS

■ We review a trial court's evidentiary rulings only for clear abuse of discretion. *See United States v. Veltmann*, 6 F.3d 1483, 1491 (11th Cir.1993). Questions of law and questions of the application of the law to the facts receive *de novo* review, while a trial court's findings of fact are reviewed under the clearly erroneous standard. *See United States v. Garcia*, 13 F.3d 1464, 1471 (11th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 2723, 129 L.Ed.2d 847 (1994).

### A. RULE 804(b)(3) ISSUES

The Thomases' first two challenges to their convictions relate to the district court's evidentiary ruling that defense counsel could not testify to certain statements made to them by witnesses who invoked their Fifth Amendment privilege against self-incrimination and refused to testify at trial.

The Thomases' defense was that they lacked the intent to defraud their clients. To prove this, they sought to introduce evidence that they themselves had relied upon the representations of a Texas brokerage firm, the McCoy West Group, that it would present the Regency Group's loan "packages" to New York and European lenders to obtain funding. At trial, the defense called William McCoy III to the stand and explained that it also planned to call Mary McCoy and William McCoy, Jr. to testify. The three McCoys were principals of the McCoy West Group. The Thomases assert that the McCoy West Group did present some of the Regency Group's loan packages to New York and European lenders, and that the McCoys would have confirmed this assertion on the stand.

However, all three McCoys invoked their Fifth Amendment privilege against self-incrimination and refused to testify. Defense counsel then sought to introduce hearsay evidence of the McCoys' earlier statements, under Federal Rule of Evidence 804(b)(3), by putting the attorney for Elizabeth Thomas on the stand to testify to what the McCoys had told that attorney while she was interviewing them in anticipation of their testifying at trial. The trial court excluded as hearsay counsel's testimony. On appeal, the Thomases assert that the district court erred in refusing to admit the evidence for two reasons, contending: (1) that Rule 804(b)(3) mandates admission; and (2) that exclusion of the evidence deprived the Thomases of their right to a fair trial.

■ Rule 804(b)(3) states that the hearsay rule does not exclude a "statement against interest" if the declarant is unavailable as a witness. The rule defines a statement against interest as:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Fed.R.Evid. 804(b)(3). Thus the rule establishes a three-prong test for the admission of statements against interest in criminal cases: (1) the declarant must be unavailable; (2) the statement must be against the declarant's penal interest; and (3) corroborating circumstances must clearly indicate the trustworthiness of the statement. *United States v. Walker,* 59 F.3d 1196, 1199 (11th Cir.1995).

■ Because they invoked their Fifth Amendment privilege to remain silent, it is clear that the McCoys were unavailable. *See United States v. Hendrieth,* 922 F.2d 748, 750 (11th Cir.1991). However, it is equally clear that the second prong of the test is not met. The Supreme Court has recently held that Rule 804(b)(3) "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." *Williamson v. United States,* —— U.S. ——, ——, 114 S.Ct. 2431, 2435, 129 L.Ed.2d 476 (1994). As a result of that decision, we consider each statement individually when analyzing whether the statements meet the against-interest prong of the Rule 804(b)(3) test.

Defense counsel proffered several statements that the three McCoys made regarding their involvement with the Thomases. They asserted that Mary McCoy had told defense counsel the following: that she had submitted packages from the Regency Group to a bank in Switzerland; that the packages submitted by the Thomases "were exceptionally well put together"; that she could provide the names of some of the McCoy West Group's lenders in New York and Switzerland; that Wilda Thomas constantly called the McCoy West Group to find out the status of the packages, even to the point of being intrusive; and that the McCoy West Group allowed the Regency Group to adopt their non-disclosure forms. In addition, Mary McCoy would have explained the fee structure and the expenses charged by the McCoy West Group.

Defense counsel asserted that in addition to confirming Mary McCoy's statements, William McCoy III told counsel that he presented packages to the New York and European lenders; he described how the McCoy West Group interviewed a client and put a lending package together; he confirmed that the McCoy West Group charged the Regency Group, which was one of their clients, expense money; he stated that he had presented certain Regency Group packages to a certified public accountant, who had presented the packages to a Swiss bank; he stated that Wilda Thomas wanted to go on trips with him to present their loan packages to lenders; and he also stated that Wilda Thomas did go to the Channel Islands to meet with one of the McCoy West Group's contacts regarding one of the Regency Group's loan packages.

The defense also proffered that William McCoy, Jr., the father of William McCoy III, stated to defense counsel that Wilda Thomas was "always pushing," and that he was on the trip Wilda took to the Channel Islands. He explained that the McCoy West Group handled several of the Thomases' real estate deals, and that he had told Wilda Thomas a bank had approved one of the Regency Group's loan requests. William McCoy, Jr. told defense counsel about working on several of the loan packages of former Regency Group clients who testified in the Thomases' trial.

None of these statements are inculpatory, as Rule 804(b)(3) requires, but just the opposite. Each statement tends to exculpate the McCoys themselves from any allegation of participation in a sham business or fraud. The Supreme Court in *Williamson* did note that facially neutral statements might actually be against a declarant's interest: " 'Sam and I went to Joe's house' might be against the declarant's interest if a reasonable person in the declarant's shoes would realize that being linked to Joe and Sam would implicate the declarant in Joe and Sam's conspiracy." *Williamson,* —— U.S. at ——, 114 S.Ct. at 2437. But even though a neutral statement might be against a declarant's interest, the exculpatory statements in this case do not "so far tend[ ] to subject the declarant to ... criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed.R.Evid. 804(b)(3).

The Thomases argue that the very fact that the McCoys pleaded their Fifth Amendment privilege against self-incrimination following the prosecutor's assertion that she considered them unindicted co-conspirators indicates that the McCoys' statements to defense counsel were sufficiently against their penal interest for purposes of Rule 804(b)(3). That is not so. The "against penal interest" requirement of Rule 804(b)(3) is more narrow than the Fifth Amendment's declaration that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. The McCoys might well have invoked their Fifth Amendment privilege because they feared that on cross-examination at the Thomases' trial, the prosecutor would wrench from them statements, within the scope of the direct examination, that incriminated them even though their earlier statements and testimony on direct examination had not. In contrast, Rule 804(b)(3) requires the proffered statements themselves to be so against the McCoys' penal interest that the McCoys would not have made those statements unless they believed them to be true. Because the statements are exculpatory in nature, they do not meet that requirement of the second prong of the Rule 804(b)(3) test, and thus were not admissible.

■ The second issue relating to the exclusion of the McCoys' out-of-court statements is whether, even though the statements were outside the ambit of Rule 804(b)(3), the exclusion of them from evidence denied the Thomases their right to a fair trial. The Thomases contend that without the McCoys' statements, they could not put forth their defense that they lacked the requisite intent to defraud. The Thomases cite three cases for support: *Green v. Georgia*, 442 U.S. 95, 97, 99 S.Ct. 2150, 2151–52, 60 L.Ed.2d 738 (1979); *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973); and *United States v. Benveniste*, 564 F.2d 335, 337 (9th Cir.1977). In all three, the defendant's constitutional rights were violated by the trial court's decision to exclude "testimony from a witness concerning statements made by another person to that witness which tended to incriminate the other person and exculpate the de-

fendant." *Benveniste*, 564 F.2d at 342. *See also Green*, 442 U.S. at 96, 99 S.Ct. at 2151.

The present case is distinguishable from *Green*, *Chambers*, and *Benveniste*, because the statements made by the McCoys did not tend to incriminate them. Furthermore, the exclusion of the testimony in question did not prevent the Thomases from making their good faith defense, because other defense witnesses in this trial testified that the Thomases appeared to have been working in their clients' interest. For example, one defense witness who briefly worked in the McCoy West Group office testified that the Thomases would frequently visit the McCoy West Group in Houston, bringing with them loan packages or supplemental information for such packages. Another defense witness testified that Wilda Thomas frequently called to inquire about the status of the Regency Group's packages, but that the McCoys avoided her. In these circumstances, the district court's exclusion of defense counsel's testimony about what the McCoys told her did not violate the Thomases' right to a fair trial, and it was not an abuse of discretion.

## B. OTHER ISSUES RELATING TO ALLEGED JUDICIAL ERROR AND PROSECUTORIAL MISCONDUCT

The Thomases next argue that "the cumulative effects of governmental misconduct and judicial error combined to deprive the defendants of a fair trial," and they raise nine allegations of judicial and prosecutorial error that they argue require reversal. None has merit. The first three, which we reject without discussion, are: (1) that the defense case was prejudiced when FBI agents, long before the indictment, interviewed the Thomases after assuring them that they did not need a lawyer; (2) that the district court's grant of a two-month continuance when the Thomases requested a six- to nine-month continuance violated their due process rights; and (3) that the prosecution acted improperly when it suggested that the McCoys might want to plead the Fifth Amendment and refuse to testify. The remaining six issues require some discussion.

### 1. Whether Pre–Indictment Delay Barred This Prosecution

■ The first of those six issues is whether due process principles barred the prosecution because of the fifty-five month delay between the time that the Thomases committed the actions for which they were convicted and their indictment. To prove a due process violation resulting from a pre-indictment delay, the Thomases must show: (1) actual prejudice to their defense from the delay; and (2) that the delay resulted from a deliberate design by the government to gain a tactical advantage. *See United States v. LeQuire,* 943 F.2d 1554, 1560 (11th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992); *United States v. Reme,* 738 F.2d 1156, 1163 (11th Cir.1984), *cert. denied,* 471 U.S. 1104, 105 S.Ct. 2334, 85 L.Ed.2d 850 (1985). We need not decide whether the Thomases have satisfied the prejudice prong, because the burden is on the defendant to show that pre-indictment delay was deliberate for the purpose of tactical advantage, and it is enough to note that the Thomases have failed to carry that burden.

The Thomases argue that the government deliberately waited until after Whittington and William McCoy, Jr., had been convicted before indicting the Thomases, thereby achieving the tactical advantage of being able to argue to the jurors that the persons immediately "above and below" the Thomases in the conspiracy had already been convicted. This argument fails because, although the prosecutor did mention in closing argument that McCoy, Jr., and Whittington had already been convicted, after the defense objected to the mention of Whittington's conviction,[1] the prosecutor agreed that any references she had made to that conviction were improper and needed to be cured. The trial court then gave curative instructions that the jury should not consider either McCoy, Jr.'s or Whittington's convictions. It is unreasonable to assume that the prosecutor deliberately delayed in indicting the Thomases so that she could obtain an advantage that she so readily conceded away at trial.

Even though it does not have the burden of coming forward with a reason, the government explains that it delayed prosecuting the Thomases because prior to 1992 it lacked sufficient evidence to convict them. According to the government, in 1992 Carolyn Whittington began to cooperate with the FBI investigation of the Thomases as part of a plea bargain in her own criminal case. The government brought its charges against the Thomases shortly thereafter. In other words, the delay was for investigative purposes.

■ "[E]ven where the defendant has been prejudiced by preaccusation delay, if it is investigative delay the defendant has not been deprived of due process." *LeQuire,* 943 F.2d at 1560 (quoting *Reme,* 738 F.2d at 1163). The prosecutor in this case has explained that the delay was caused by lack of satisfactory evidence, and the Thomases have provided no plausible reason for us to doubt her word.[2] A prosecutor has no obligation to bring charges as soon as she has enough evidence to indict; instead, she may wait until she is satisfied that she has enough evidence to establish guilt beyond a reasonable doubt. *E.g., United States v. Butler,* 792 F.2d 1528, 1533 (11th Cir.), *cert. denied,* 479 U.S. 933, 107 S.Ct. 407 (1986). As the Supreme Court has explained:

> In our view, investigative delay is fundamentally unlike delay undertaken by the

---

1. The defense did not object to the prosecutor's mention of McCoy, Jr.'s conviction, perhaps because counsel for Wilda Thomas mentioned that conviction in his own closing argument.

2. The Thomases contend that the government's asserted explanation for the delay is false, because: (1) the FBI had interviewed Whittington as early as 1988 and had gotten information about the Thomases from Whittington at that time; and (2) the government chose not to call Whittington as a trial witness, which demonstrates that Whittington was not a crucial wit-

ness. However, the fact that Whittington had been interviewed as far back as 1988 does not conflict with the prosecutor's assertion that Whittington did not actually cooperate until 1992, because the interviewing FBI agent informed the trial court that he thought Whittington had lied during the 1988 interview in order to exonerate herself. Nor is the prosecutor's failure to call Whittington to the stand at trial proof that her cooperation was unrelated to the prosecutor's delay.

Government solely "to gain tactical advantage over the accused," precisely because investigative delay is not so one-sided. Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt.

*United States v. Lovasco,* 431 U.S. 783, 795, 97 S.Ct. 2044, 2051, 52 L.Ed.2d 752 (1977) (citation omitted). Because the Thomases have not met their burden of proving intentional delay for tactical advantage, we hold that the fifty-five month pre-indictment delay does not require reversal.

2. Whether the District Court Erred in Refusing to Allow the Thomases to Subpoena Government Documents

■ The Thomases next contend that the district court erred when it refused to permit them to subpoena government files so that they could examine those files for evidence that the government had delayed their indictment in order to gain a tactical advantage. The issuance of subpoenas is within the sound discretion of the trial court. *See United States v. Perez–Tosta,* 36 F.3d 1552, 1556 n.2 (11th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995).

The district judge presiding at the pretrial motions hearing refused to issue the subpoena, declaring, "I'm not going to let you go on a fishing expedition." The Thomases renewed their request at trial, and the trial court again denied it. We agree with the district court that in the absence of any indication that hidden reasons for the delay could be found in those files, the defendants were not entitled to subpoena them.

3. Whether the District Court Erred in Ruling Certain Deposition Evidence Inadmissible ·

The Thomases made a pre-trial motion requesting that they be allowed to introduce deposition evidence of six witnesses alleged to be essential to their defense. All six witnesses are brokers or lenders' representatives in Europe, and five of them were de-posed shortly after criminal charges were filed in Texas state court against William McCoy, Jr. In those prior depositions, the five had confirmed that the McCoys did provide them with loan packages for presentation to European lenders; however, none of the five had mentioned the Thomases in their depositions. Because the six foreign witnesses are beyond the subpoena power of the court, the Thomases' court-appointed attorneys requested that the court either allow them to go to Europe to take video depositions, or allow them to use in this trial the witnesses' depositions from William McCoy, Jr.'s state trial. The court denied both requests.

In its order denying the requests, the court explained that the Thomases had failed to make the "exceptional circumstances" showing required by Rule 15(a) of the Federal Rules of Criminal Procedure, which authorizes depositions in a criminal case. The court also noted that "it appears that the testimony sought to be elicited is cumulative to testimony that can be otherwise obtained at trial." At the time of the ruling, both sides anticipated that the McCoys would be called to testify, and the government had argued that the foreign witnesses' depositions would be merely corroborative of the McCoys' testimony. The government and defense did agree, however, to a stipulation as to the contents of each of the five existing state trial depositions. The stipulations were read to the jury.

■ We review the first deposition issue—whether the district court erred in refusing to allow the Thomases to take a Rule 15(a) deposition—for abuse of discretion. *United States v. Ramos,* 45 F.3d 1519, 1522 (11th Cir.1995) ("Rule 15 permits a district court to authorize a deposition in a criminal case when exceptional circumstances exist. The court's decision to authorize or deny the deposition will be upset only for an abuse of discretion."). The moving party bears the burden of showing that exceptional circumstances exist to warrant the deposition, *United States v. Drogoul,* 1 F.3d 1546, 1551 (11th Cir.1993), and we have held that in analyzing whether the circumstances are sufficiently exceptional, we consider whether:

(1) the witness is unavailable; (2) injustice will otherwise result without the material testimony that the deposition could provide; and (3) countervailing factors would make the deposition unjust to the nonmoving party. *Ramos,* 45 F.3d at 1522–23.

 In this case, the government has conceded that the six witnesses are foreign nationals living outside the country. Thus they are beyond the subpoena power of the district court. *See Drogoul,* 1 F.3d at 1553. Moreover, at least four of the six witnesses that the Thomases sought to depose were unwilling to testify at trial.[3] Because we have previously held that "a substantial likelihood of unavailability can be found when the proposed deponent is beyond the subpoena powers of the United States and has declared his unwillingness to testify at trial, or even having declared willingness to testify cannot be subpoenaed if he changes his mind," *Ramos,* 45 F.3d at 1523, these witnesses were unavailable for purposes of exceptional circumstances analysis.

However, turning to the second factor, injustice did not result from the court's refusal to permit videotape depositions of the European witnesses, because the Thomases had not made a sufficient proffer that the depositions could have provided testimony that would have been material to their defense. The Thomases argued that the depositions would be material because these witnesses would have provided the sole credible testimony that the McCoys actually did present loan packages to various European lenders, thus supporting the Thomases' defense that they thought that they were doing legitimate business with the McCoys. However, this aspect of the witnesses' testimony was sufficiently presented by the joint stipulation that was read to the jury. As part of that stipulation, for example, the jury heard that one of the witnesses would have testified that he was a senior vice president of Handels Bank in Zurich, Switzerland, and that "McCoy West Group submitted between fifteen and fifty projects to Handels Bank and the McCoy West Group representatives visited the bank eight to ten times." According to

the stipulation, another witness who ran her own loan brokerage company in Jersey Island would have testified that she eventually presented four or five of the McCoys' projects to other brokers, and to banks.

Although they did not raise the issue before the district court, on appeal the Thomases argue that the stipulation was insufficient because "none of that testimony was tied in to the Thomases." However, the Thomases themselves have not asserted that any of the foreign witnesses could testify that the Regency Group packages were among the McCoy West packages that were actually submitted to the European banks. Instead, the only statement the Thomases have proffered that was not covered by the stipulation was that some of the witnesses would have testified that they met the Thomases, that they spoke to the Thomases on the phone, and that they received letters from them. Even assuming that we should consider this argument which was made for the first time on appeal, we are satisfied that the refusal to permit the videotape depositions did not result in injustice. Given the Thomases' asserted defense that they lacked the intent to defraud because they believed the McCoy West Group to be legitimate, any testimony that the Thomases themselves met with some of these witnesses would be only marginally more probative on the issue of their intent than the stipulated evidence that the McCoys met with five of those witnesses. We therefore hold that this attenuated link between the Thomases and legitimate European lenders was not so material that the district court's refusal to authorize the foreign depositions resulted in injustice, which is the second factor of the exceptional circumstances analysis.

The third factor in the exceptional circumstances analysis is whether countervailing factors in favor of the government would render the deposition unjust, *see Ramos,* 45 F.3d at 1523, but no evidence of any such factors has been presented. After examining the three factors in the exceptional circumstances analysis, we conclude that the district court did not abuse its discretion in refusing

---

**3.** A fifth witness was willing only if he was advanced the costs, and defense counsel did not provide any explanation regarding the sixth witness.

**1342**

to authorize the deposition of the six brokers or lenders' representatives.

■ As to the second deposition issue—the Thomases' alternative argument that they should have been allowed to enter the existing Texas state court depositions into evidence in this case—the district court denied the motion on the grounds that "the testimony sought to be elicited is cumulative to testimony that can be otherwise obtained at trial." At the time of the ruling, both the court and the parties anticipated that the McCoys would be called as witnesses and that they would testify that they had in fact presented loan packages to various European lenders. Thus the testimony from the five deposed witnesses appeared to be cumulative of the testimony expected from the McCoys. The district court's reason for ruling that the deposition testimony was merely cumulative was correct at the time of the ruling, and the Thomases did not raise the issue again until this appeal. Instead, even after it was clear that the McCoys in fact would not testify, the parties agreed upon the contents of the stipulation that was read before the jury. Under these circumstances, the district court did not abuse its discretion in denying use of the Texas state court depositions at trial.

4. Whether the District Court Committed Reversible Error in Connection with Evidence About the Defendants' Misuse of a Power of Attorney and Its Consequences

■ At trial, the most compelling witness for the prosecution was Colonel Roosevelt Lewis, who had granted a power of attorney to Elizabeth Thomas as President of the Regency Group shortly before he left for an assignment in the Philippines. The district court allowed Lewis to testify that he had been sued upon his return because the Thomases had used their power of attorney to borrow money without his knowledge and had failed to repay the loan. The court also allowed Lewis to testify that as a result of his unsuccessful dealings with the Thomases, he had been forced to pay a "loan shark" a highly inflated sum to prevent foreclosure on his house. Defense counsel objected numerous times to the relevancy of the testimony concerning the lawsuit, but the district court overruled these objections. After Lewis testified that he nearly lost his house because of the Thomases' actions, however, the district court issued a curative instruction to the jury that: "The fact that [Colonel Lewis] may or may not have suffered some other consequences is really not an issue before you."

On appeal, the Thomases argue that their due process rights were violated, because Lewis's testimony regarding the lawsuit and the near-foreclosure on his house was inadmissible under Federal Rule of Evidence 404(b), which prohibits the introduction of "evidence of other crimes, wrongs, or acts ... to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b). They also contend that the trial judge's instruction to the jury was insufficient to cure the prejudice caused by the introduction of the evidence. We disagree.

First, the only evidence that arguably was excludable under Rule 404(b) was Lewis's testimony that the Thomases misused their power of attorney. However, evidence of the Thomases' misuse of the power of attorney is not extrinsic within the meaning of Rule 404(b) "if it is [evidence of] an uncharged offense that arose out of the same transaction or series of transactions as the charged offense." *United States v. Muscatell,* 42 F.3d 627, 630 (11th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2617, 132 L.Ed.2d 859 (1995). The Thomases were not indicted for their actions in borrowing money in Lewis's name without informing him, and without transferring the proceeds to him. Nevertheless, those actions arose out of a fraudulent activity with which the Thomases *were* charged—namely, devising a scheme to fraudulently obtain money from individuals and businesses who were interested in receiving substantial loans. The evidence was admissible because it had probative value beyond "demonstrat[ing] solely that, because the defendant engaged in some other 'bad act,' the defendant is likely to have engaged in the currently charged illegal act." *United States v. Chandler,* 996 F.2d 1073, 1101 (11th Cir.1993) (citation omitted), *cert. denied,* ——

U.S. ——, 114 S.Ct. 2724, 129 L.Ed.2d 848 (1994).

■ Rule 404(b) likewise does not apply to the testimony regarding the sale of the house because it did not involve extrinsic bad acts by the Thomases, but instead described consequences of the fraud offense. If anything, the evidence of the near-foreclosure might have been excluded under Fed.R.Evid. 402, as irrelevant evidence, or under Fed. R.Evid. 403, as evidence whose probative value is substantially outweighed by the danger of unfair prejudice. However, even if the evidence of the near-foreclosure ought to have been excluded under Rules 402 or 403, the trial judge sufficiently and immediately cured the prejudice to the defendants by instructing the jury not to consider Lewis's testimony regarding consequences that went beyond the Thomases' actions and what they represented to Lewis that they could do. This instruction came immediately after the testimony in question, and it ordered the jury to disregard all "other consequences" to Colonel Lewis. The instructions rendered harmless any error caused by the admission of the evidence.

5. Whether the Prosecutor's Remarks During Closing Argument Warranted a New Trial

During her closing argument, the prosecutor stated: "Carolyn Whittington is not on trial. That has already been decided. The McCoy's [sic] are not on trial. That has already been decided." In rebuttal, the prosecutor once again stated:

> The defense wants to claim on one hand that the McCoy's [sic] were crooks and we were duped, too, but they also want to claim on the other hand that they had real lenders. They had real lenders.
>
> Which is it? It's probably neither. We know that they are crooks. Mr. McCoy, Junior has been convicted. So has Carolyn Whittington.

The Thomases moved for a mistrial on the ground that it was improper for the prosecutor to indicate that Whittington had been convicted or had pleaded guilty to the same charges as the Thomases. The trial judge issued a curative instruction to the jury to disregard the statement that Whittington had been convicted or found guilty, because it was irrelevant to the issue of the Thomases' guilt. The Thomases appeal the denial of the motion for mistrial.

■ Prosecutorial misconduct mandates a new trial if: (1) the remarks are improper, and (2) the remarks prejudiced the defendant's substantive rights. *United States v. Delgado*, 56 F.3d 1357, 1368 (11th Cir.1995); *United States v. Cole*, 755 F.2d 748, 767 (11th Cir.1985). However, even if the remarks were prejudicial, they "may be rendered harmless by curative instructions to the jury." *United States v. Lichenstein*, 610 F.2d 1272, 1282 (5th Cir.), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980). Here, the court promptly issued its curative instruction to the jury, and the instruction clearly informed the jury that it should not include Whittington's conviction in its considerations. Given the considerable weight we afford to a trial court's assessment of the effect of a prejudicial closing remark, *see United States v. Herring*, 955 F.2d 703, 710 (11th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 353, 121 L.Ed.2d 267 (1992), we hold that the trial court did not abuse its discretion in denying the Thomases' motion for mistrial. *See United States v. Badia*, 827 F.2d 1458, 1467 (11th Cir.1987), *cert. denied*, 485 U.S. 937, 108 S.Ct. 1115, 99 L.Ed.2d 275 (1988).

6. Whether the Cumulative Effect of the Error at Trial Rendered the Trial Fundamentally Unfair

■ The Thomases argue that the combination of all the above alleged errors together denied them a fair trial. We have held that the "cumulative effect" of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are nonreversible. *United States v. Pearson*, 746 F.2d 787, 796 (11th Cir.1984); *see also United States v. Preciado–Cordobas*, 981 F.2d 1206, 1215 n.8 (11th Cir.1993). However, even considered cumulatively, any errors in this case did not deprive either of the Thomases of a fair trial.

## III. ISSUES RELATING TO THE SENTENCES

The Thomases raise two issues relating to their sentences. First, they contend that the district court improperly applied a two-level upward adjustment to both defendants' base offense levels under the vulnerable victim provision, § 3A1.1 of the United States Sentencing Guidelines. Second, they argue that the court erred when it imposed in each of their cases a two-level § 5K2.5 upward departure for consequential financial losses to the victims. We conclude that they are wrong on one issue and right on the other: the vulnerable victim adjustment was not error, but the upward departure for consequential financial losses was.

### A. VULNERABLE VICTIM ADJUSTMENT

 The district court applied a two-level upward adjustment in the offense level because it found Colonel Lewis to be a "vulnerable victim" within the meaning of the Sentencing Guidelines. Under § 3A1.1 of the Guidelines, "If the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct, increase by 2 levels." United States Sentencing Guidelines § 3A1.1 (Nov. 1992).

"The district court's application of § 3A1.1 presents a mixed question of law and fact, which we review *de novo.*" *United States v. Davis,* 967 F.2d 516, 523 (11th Cir.1992). "The district court's findings of historical fact, however, cannot be reversed unless clearly erroneous." *Id.* In this case, the sentencing judge found that:

> The testimony of Colonel Lewis does fall within the vulnerable victim status, because he was going to the Philippines on short notice and would be gone for a lengthy period of time and his providing the defendant with a power of attorney afforded her the opportunity to continue the fraud.

The district court also found that Lewis was a vulnerable victim "specifically because of the defendants' knowledge of his being gone to the Philippines for three years...." The

court did not clearly err in finding as a matter of fact that Lewis's extended absence made him unusually vulnerable to the advance fee fraud scheme. Lewis testified during the sentencing hearing that he had great difficulty communicating with the Thomases from the Philippines, because they would not return his telephone calls or his letters. Lewis also testified that he had hired the Regency Group because he could not readily return to the United States to tend to his financial affairs.

The Thomases argue that the district court nevertheless erred in applying § 3A1.1 to this case, because vulnerability for sentencing purposes is measured at the time of the commencement of the crime, and Lewis's vulnerability—defined as his absence from the country—did not arise until after the crime began. They note that Lewis was a particularly sophisticated investor who consulted with his lawyers before engaging in business with the Thomases; and they contend that the fact that Lewis was vulnerable enough to be defrauded by the Regency Group did not distinguish him from any of the other victims of the fraud.

The question is not whether Lewis was sophisticated or naive, but whether Lewis could be considered a vulnerable victim for sentencing purposes if his absence from the country, which the district court found made him particularly susceptible to the criminal conduct, did not arise until after the Thomases had initially targeted and begun to defraud him.

The two circuits that have most explicitly addressed the issue of a victim's vulnerability arising after the initial targeting have reached opposite conclusions. *Compare United States v. O'Brien,* 50 F.3d 751, 754–55 (9th Cir.1995) (holding § 3A1.1 does not require defendants to have targeted victims because of their vulnerability, and excludes only those whose vulnerability was not known to defendants) *with United States v. Rowe,* 999 F.2d 14, 17 (1st Cir.1993) (holding § 3A1.1 applies only to victims whom the defendant targeted because of their vulnerability). This Court's own precedent appears to be somewhat ambiguous on the issue.

*Compare United States v. Long,* 935 F.2d 1207, 1210 (11th Cir.1991) ("Section 3A1.1 is intended to enhance the punishment for offenses where *the defendant selects the victim* due to the victim's perceived susceptibility to the offense.") *with United States v. Salemi,* 26 F.3d 1084, 1088 (11th Cir.) (holding that crime involving six-month old baby automatically justified vulnerable victim enhancement even though defendant apparently did not select victim for that reason), *cert. denied,* —— U.S. ——, 115 S.Ct. 612, 130 L.Ed.2d 521 (1994). We need not resolve that ambiguity here, because under either interpretation of § 3A1.1, the vulnerable victim enhancement was properly applied in this case.

At the sentencing hearing, the district court made a finding of fact that Lewis was more vulnerable to fraud than the average victim, because while he was abroad Lewis lacked "the ability to in any way, any meaningful way, be able to monitor [the Thomases'] activities, or in this case, inactivities." The court further found that the Thomases knew of Lewis's absence, and that because of his impending absence they encouraged him to give them a power of attorney, which "more easily facilitated their continuing fraud that was committed against him and may have, in fact, actually caused him greater damages." We believe that these factual findings are sufficient to support application of § 3A1.1.

■ The commentary to the guideline states that the adjustment applies where a vulnerable victim "is made a target of criminal activity by the defendant." U.S.S.G. § 3A1.1, comment. (n.1). Even if we interpret the guideline to require the Thomases to have targeted Lewis because he was vulnerable, the district court correctly noted that the fraud in which the Thomases engaged was *continuing* : the "thrust of the wrongdoing," *Rowe,* 999 F.2d at 17, in this case was to fraudulently obtain money under the guise of providing loan assistance, and the Thomases successfully sought advance fee money from Lewis during the time that he lived abroad. In addition, while Lewis was away, the Thomases used the power of attorney they secured from Lewis because of his absence to borrow more than $7000 in his name. They also used the same power of attorney to borrow $5000 in Colonel Lewis's name from Joe Roberts, another Regency Group victim.

The Thomases exploited the fact that Lewis was vulnerable by using the power of attorney they had earlier obtained to garner two loans without his knowledge. These acts were sufficient to constitute the "targeting"—or "retargeting," as it may have been—of Lewis as a victim in order to take advantage of his vulnerability, his absence. By the same token, the acts demonstrate that the Thomases actually knew that Lewis's absence from the country made him vulnerable to their fraud, or to a continuation of it.

■ For these reasons, the district court's application of the two-point vulnerable victim enhancement under § 3A1.1 is affirmed. But we note that this holding is limited in scope. We hold only that in cases where the "thrust of the wrongdoing" was continuing in nature, the defendants' attempt to exploit the victim's vulnerability will result in an enhancement even if that vulnerability did not exist at the time the defendant initially targeted the victim. *Cf. United States v. Newman,* 965 F.2d 206, 212 (7th Cir.1992) ("whatever Newman may have thought when he first met [the victim], at some time during their eight-month relationship he must have realized that he was dealing with someone abnormally susceptible to intimidation and deceit.")

## B. UPWARD DEPARTURE FOR CONSEQUENTIAL DAMAGES

■ The district court correctly held that the amount of loss to be used in calculating the Guidelines offense level was limited to the amount the victims paid in advance fees. But the court then applied a two-level upward departure from the applicable sentencing range under § 5K2.5 of the Sentencing Guidelines, based upon consequential financial damages to the victims beyond the amount they paid in advance fees to the defendants. *See* U.S.S.G. § 5K2.5, p.s.

The Thomases argue that the court erred when it used consequential damages to sup-

port its departure, for three reasons. They contend: (1) that consequential damages should not have been used as a basis for departure because those damages were adequately considered in establishing the guideline range; (2) that the court improperly prevented them from cross-examining the witnesses on the issue of consequential damages at the sentencing hearing; and (3) that the imposition of a two-level upward departure was unreasonable given the circumstances of the case. Because we agree with their first contention, we need not address the other two.

We apply a three-step review to departures from the Sentencing Guidelines. The first step, which we review *de novo*, is to determine whether the Sentencing Guidelines adequately consider a particular factor, thereby precluding a sentencing court from relying on it as a basis for departure. *United States v. Valle*, 929 F.2d 629, 631 (11th Cir.), *cert. denied*, 502 U.S. 950, 112 S.Ct. 401, 116 L.Ed.2d 350 (1991); *see also United States v. Lnu*, 16 F.3d 1168, 1169 (11th Cir. 1994), *modified*, *United States v. Omar*, 24 F.3d 1356 (11th Cir.1994). The Thomases' contention that the district court erred in determining that consequential damages are not adequately considered under the Sentencing Guidelines finds strong support in one of our recent decisions.

*United States v. Wilson*, 993 F.2d 214 (11th Cir.1993), involved a calculation of loss for sentencing purposes in an advance fee scheme case with facts quite similar to this one. To determine the appropriate base offense level, the district court in *Wilson* based its calculation of loss on the principal face amount of the loans promised, which totaled over $30 million, instead of on the approximately $100,000 in advance fees the victims of the fraud paid to the defendants. *Id.* at 216. We held that the district court had erred, because according to the Sentencing Guidelines, " 'loss is the value of the money, property, or services unlawfully taken.' " *Id.* at 217 (quoting U.S.S.G. § 2F1.1, comment. (n.7) (Nov.1992)); *see also* U.S.S.G. § 2B1.1, comment. (n.2). We noted that the Sentencing Commission had expressly allowed district courts to include "reasonably foresee-

able consequential damages" in calculating loss for cases involving government procurement and product substitution frauds, but had determined that "the victim's direct loss and the sophistication of the criminal scheme have been selected as the two primary determinants of the appropriate sentence for other types of fraud." *Wilson*, 993 F.2d at 217 (footnote omitted). In other words, the Commission had expressly considered and rejected consequential damages as a factor in determining offense levels under the Sentencing Guidelines, except for government procurement and product substitution cases.

The fact that the Commission deliberately allowed an increase for consequential damages in some but not all types of frauds indicates that "the absence of an increase . . . is a result of design rather than inadvertence." *LNU*, 16 F.3d at 1170. However, our inquiry does not cease with the determination that the Commission considered consequential damages in establishing the Guideline: under the first prong of the three-part departure analysis, a departure may be permitted if the damages were not *adequately* considered in establishing the Guideline range. "Where a particular aspect of an offense is incorporated in the underlying offense guideline, 'departure from the applicable guideline range is warranted only if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense.' " *Id.* at 1171 (quoting U.S.S.G. § 5K2.0, p.s.). Thus if the consequential damages in this case were "substantially in excess" of what ordinarily is involved in an advance fee scheme case, the Guidelines do not adequately consider consequential damages, insofar as this case is concerned.

We believe that the consequential damages in this case were not substantially in excess of the typical fraud case. In *Wilson*, we noted:

> [S]ome degree of consequential reliance by the victim is also to be expected in the majority of fraud cases involving false pretenses, and the presence of such reliance will not generally justify departure. The fact that loss of property impairs the victim's finances or hastens insolvency does not by itself constitute grounds for depar-

ture, especially when the value of the property taken from an individual victim is relatively small, but unique factual circumstances may exist which render the loss of particular property especially harmful.

*Wilson,* 993 F.2d at 218. In this case, the consequential damages presented at the sentencing hearing included travel fees, accounting fees and phone bills, attorneys fees, and appraisals. In addition, the district court included "the fraudulently acquired loan," which presumably was the $7,333 loan the Thomases borrowed using Lewis's power of attorney. All of the various service fees and bills incurred by the victims are clearly typical of a crime of fraud, and we believe that the $7,333 loan, even if it does not usually occur in an advance fee scheme, is not a consequential damage so "outside the heartland" for the crime of fraud that the district court should have exercised its power to depart from the Guidelines solely because of it. *LNU,* 16 F.3d at 1171.

The circumstances of this case were not so extraordinary as to render the Guidelines' considerations of circumstantial damages inadequate. We therefore vacate and remand for resentencing without that upward departure.[4]

## IV. CONCLUSION

The Thomases received a fair trial, but their sentence was affected by error. Accordingly, we VACATE and REMAND for new sentencing proceedings to be held in accordance with this opinion.

---

4. On remand, the district court should clarify its Report of Statement of Reasons for Imposing Sentence. The presentence investigation report ("PSI") recommended that the total offense be sixteen, calculated by adding six as the base offense level, *see* U.S.S.G. § 2F1.1(a); plus six as the specific offense characteristic (for loss of property valued at more than $70,000 and less than $120,000), *see* U.S.S.G. § 2F1.1(b)(1)(G); plus two because the offense involved more than one victim, *see* U.S.S.G. § 2F1.1(b)(2); plus two for the Thomases' organizational role in the offense, *see* U.S.S.G. § 3B1.1(c). That equals an offense level of sixteen.

The district court adopted the factual statements of the PSI, which had also recommended an offense level of sixteen, then added two levels for the "vulnerable victim" adjustment under U.S.S.G. § 3A1.1, and departed upward two levels for loss of property under § 5K2.5. However, the court stated that the Thomases' total offense level then was nineteen instead of twenty, which is the total of sixteen and four. The district court should clarify its calculations on remand.